NAACP LEGAL DEFENSE AND EDU-
CATIONAL FUND, INC., Plaintiff,

v.

Alan CAMPBELL, Director, United
States Office of Personnel
Management, Defendant.

PUERTO RICAN LEGAL DEFENSE
AND EDUCATION FUND,
INC., Plaintiff,

v.

Alan CAMPBELL, Defendant.

Civ. A Nos. 80–1888, 80–2070.

United States District Court,
District of Columbia.

Jan. 19, 1981.

Jack Greenberg, James M. Nabrit, III, Charles Stephen Ralston, New York City, Elaine R. Jones, Barry L. Goldstein, Brent Simmons, Washington, D. C., for plaintiff in No. 80–1888.

William L. Robinson, Norman C. Cachkin, Washington, D. C., M. D. Taracido, Robert L. Becker, New York City, for plaintiff in No. 80–2070.

John D. Bates, Asst. U. S. Atty., Margery Waxman, James Green, Stuart Rick, Washington, D. C., for defendant in both cases.

## MEMORANDUM

GESELL, District Judge.

Plaintiffs in these consolidated cases are charitable organizations that have been denied participation in the Combined Federal Campaign ("CFC"), an annual charitable fund-raising drive conducted by the United States Government among its employees. They contend their exclusion was arbitrary and in violation of their First Amendment rights. The facts are not in dispute and the issues are before the Court on cross-motions for summary judgment. Because of a need to resolve the matter prior to the commencement of the next CFC drive,[1] the case was briefed and argued on an expedited schedule and is now ripe for decision.

The Campaign was established pursuant to Executive Order 10927, issued on March 18, 1961, by President Kennedy. That Order delegated authority to the Chairman of the Civil Service Commission to

> make arrangements for such national voluntary health and welfare agencies and such other national voluntary agencies as may be appropriate to solicit funds from Federal employees and members of the

---

1. The deadline for applying for the CFC drive to begin in the fall of 1981 was December 31, 1980. Plaintiffs each have applied for inclusion in that drive.

armed forces at their places of employment or duty stations.

Executive Order 10927, § 2(a). Procedures and requirements for the Campaign are set forth in the Manual on Fund-Raising Within the Federal Service for Voluntary Health and Welfare Agencies.

Organizations participate in the CFC on either the national or local level. Eligibility is determined by officials of the Office of Personnel Management, successor to the Civil Service Commission, in accordance with the standards set forth in the Manual. The Campaign is conducted each fall. Contributing individuals may designate either that their donation is to go into a general fund, distributed by a formula among all the qualifying agencies, or that the donation is to go to specific agencies selected by the individual.

Each of the plaintiff organizations is a civil rights group approved by the Internal Revenue Service as a nonprofit, tax-exempt charitable organization. The primary activity of each group is to support selected litigation designed to benefit large numbers of people in such areas as housing, education, employment, and social services. They each operate on a nationwide basis, supported by voluntary contributions of time and money, and it is unquestioned that each is a responsible organization.

Both plaintiffs filed timely applications for inclusion in the current CFC drive [2] and fully pursued all administrative remedies. Each was denied inclusion, based on a failure to satisfy the criteria set forth in Section 5.21 of the Manual. That section states that

> [o]nly nonprofit, tax-exempt charitable organizations, supported by voluntary contributions from the general public and providing direct services to persons in the fields of health and welfare services are eligible for approval.

In each case, defendant contended that the plaintiffs, while otherwise qualified, do not provide "direct services," but rather serve as advocates for groups. Thus defendant stated in its letters to each plaintiff, rejecting their applications, that "Groups which provide direct services, in the area of legal assistance, are those, such as Public Defender or Legal Aid Societies, whose purpose is to represent individuals who are unable to meet the cost of retaining a private attorney, without regard to how that individual's case can influence public policy."

Plaintiffs advance three theories on which they assert they should be granted relief. First, plaintiffs argue that the "direct services" criterion abridges their First Amendment right to engage in charitable solicitation. Second, they contend that the decision to reject their applications was arbitrary and capricious and an abuse of discretion under the Administrative Procedure Act. Third, plaintiffs assert they have been denied equal protection under the Fifth Amendment because their applications were rejected while the NAACP Special Contribution Fund, a similar but wholly separate organization, was permitted to participate in the CFC drive. Defendant urges this Court to reject each of these arguments.

The Court must, of course, attempt to resolve this case on statutory grounds, under the APA, before going further and reaching the constitutional issues. But the lines between the two cannot be kept entirely separate. It is clear that whether this case is viewed strictly in constitutional terms, or merely as a challenge to agency action under the APA, there are fundamental First Amendment interests involved which necessarily influence the Court's determination.

■ Charitable solicitation is a protected First Amendment activity, as the Supreme Court re-emphasized last Term in *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 632, 100 S.Ct. 826, 834, 63 L.Ed.2d 73 (1980). Although the mechanisms of the CFC drive do not allow for the sort of persuasive, informative activity that is often present in solicitations

<hr>

2. The types of voluntary agencies permitted to participate in the CFC are set forth in section 3.1 of the Manual. Among the five broad categories of such agencies are "[n]ational agencies having a domestic welfare service function which includes direct services to meet basic health and welfare needs." This is the category for which the plaintiffs contend they qualify.

on street corners or door-to-door, *see, e. g., Village of Schaumburg, supra; Hynes v. Mayor of Oradell,* 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976), the participating organizations are afforded favorable publicity concerning their objectives and the money received may be used in some instances for activity that falls squarely within the First Amendment. Furthermore, by providing organizations the opportunity to participate in the CFC, the government has, in effect, provided a billboard or channel of communication through which organizations can disseminate their appeals to federal workers. This process has proven extremely effective in raising charitable contributions. It is clear that the government must meet First Amendment strictures in its regulations concerning access to this channel of communication, which is, in fact, the only channel by which organizations can appeal to government employees at their workplace. *See National Black United Fund, Inc. v. Campbell,* 494 F.Supp. 748, 755–56 (D.D.C.1980).

The question, then, is whether the limitation set forth in section 5.21, requiring that to qualify a charitable organization must provide "direct services," meets First Amendment standards. If it does not, any agency action based on that requirement necessarily would be "not in accordance with law" and must be set aside under this Court's review pursuant to 5 U.S.C. § 706(2) (1976).

■ The Court finds, upon considering the evidence presented and the arguments of counsel, that the "direct services" requirement does not meet First Amendment standards. It is nowhere defined and the term, standing alone, is too vague to comport with the strict standards of specificity required when limits are placed on First Amendment activity.

The United States Court of Appeals for the District of Columbia Circuit recently examined vagueness standards in the area of First Amendment activity, *see Big Mama Rag, Inc. v. United States,* 631 F.2d 1030 (D.C.Cir.1980), and found the Internal Rev-

enue Service's definition of "educational" in Treas.Reg. § 1.501(c)(3)–1(d)(3) unconstitutionally vague. That case bears many similarities to the case now before this Court. Although "direct services"—like "educational"—may appear at first glance to have a plain, unambiguous meaning sufficient to guide governmental decisionmaking, it is apparent on analysis that this standard will not withstand examination for vagueness.

The Court in *Big Mama Rag* identified two particular policies that underlie the vagueness doctrine. "First, the vagueness doctrine incorporates the idea of notice—informing those subject to the law of its meaning.... Second, the doctrine is concerned with providing officials with explicit guidelines in order to avoid arbitrary and discriminatory enforcement." *Id.* at 1035. The "direct services" requirement fails on both of these counts.

As defendant's responses both in the administrative proceedings and in discovery make clear, there are absolutely no established standards that would guide officials in determining whether or not an organization provides "direct services." Defendant concedes as much, stating only that the Manual and rejection letters "make abundantly clear" what is meant by the requirement. But the Manual and correspondence go no further than to set forth simple assertions: organizations must provide "direct services" and plaintiffs do not meet that standard. Only in arguing by analogy—stating that Legal Aid groups and Public Defenders do provide "direct services"—does defendant indicate how it will apply the standard. But these analogies amount to nothing more than an assertion that these other organizations would meet the requirement while the plaintiffs do not. The government cannot proceed on such a subjective, imprecise basis, given the nature of the regulation here attempted.

At one point in its brief, defendant implies that there may be an additional method, based on mathematical analysis of an organization's budget, by which "direct services" can be measured.[3] There are sev-

---

3. Defendant states that its calculations demonstrate that both plaintiffs spend more than 50

percent of their budgets on "litigation," while the NAACP Special Contribution Fund, the

eral weaknesses with this approach. First, it is clear from the evidence that this analysis constitutes nothing more than a *post hoc* rationalization by defendant constructed especially for this litigation. Second, and more important, it is unclear how defendant proposes to screen the budget for each organization to be certain that comparable figures are derived. Third, the Supreme Court just last Term struck down a similar percentage-based restraint in *Village of Schaumburg v. Citizens for a Better Environment, supra.* This unformulated mathematical formula, not found in any notice to applicants, does not provide the guidance required to overcome the inherent vagueness of the "direct services" standard.

Plaintiffs argue at length that they do provide "direct services" in a variety of ways. The record is replete with the results of plaintiffs' work, indicating that law suits by plaintiffs have provided millions of dollars in back pay and benefits, and invaluable other "services" such as increased training opportunities, additional promotions, improved school programs, and better hospital facilities. Apart from their litigation activities, each plaintiff also provides "direct services" through scholarship programs and education efforts. Given defendant's failure adequately to define the "direct services" requirement, it is impossible for plaintiffs to know how to conform their activities to meet that requirement short of becoming a public defender or legal aid society.

A review of the "direct services" requirement under the Administrative Procedure Act raises one additional problem as well because the requirement finds no basis in the authority establishing the CFC. It is plain from the language that section 5.21, *see* page 1366, *supra,* substantially narrows the wording of the Executive Order, *see* pages 1365–66, *supra.* The language of the Order requires only that the Chairman of the Civil Service Commission make arrangements for "appropriate" national voluntary agencies to participate in the CFC.

This could encompass groups that act "indirectly" just as easily as it would include groups that act "directly." Defendant's only response to this concern is the simple assertion that "clearly such eligibility criteria [as that of section 5.21] are within the mandate of E.O. 10927 that defendant arrange for 'appropriate' organizations" to participate. This self-serving assertion is not enough. Defendant has presented no evidence that it is "appropriate" to exclude organizations that provide only "indirect services" or that operate along general class lines rather than by meeting the needs of individuals. Where the underlying activity is so fraught with First Amendment interests, it is arbitrary and not in accordance with law for defendant cavalierly to establish such a requirement.[4]

The Court's finding that the "direct services" standard fails does not mean that the government cannot impose any restrictions on the organizations permitted to participate in charitable solicitation. In *Village of Schaumburg,* the Supreme Court noted that there is a substantial government interest in protecting the public from "'fraud, crime, and undue annoyance.'" 444 U.S. at 636, 100 S.Ct. at 835. Furthermore, establishment of the CFC itself serves the legitimate government interest in regulating interference with employees during the work day, and ensuring that organizations with access to employees at the workplace are responsible in the use of moneys collected. But these concerns have absolutely no relationship with the "direct services" requirement of section 5.21. When the government restricts First Amendment activities, the restriction must at the outset be set forth with precision. What the Court has determined here—and all that it has determined—is that the "direct services" requirement, as presently employed, does not have the precision necessary to comport with constitutional requirements.

most closely analogous organization permitted to join the CFC, spent only 25 percent of its funds in this way.

4. In view of the Court's findings on vagueness and review under the Administrative Procedure Act, it is not necessary to consider plaintiffs' equal protection claims.

In closing, it is important to note that developing constitutional doctrine is impinging more and more on the concepts that underlie the government's attempt through the CFC to control solicitation on its premises. A danger exists, which counsel for the defendant recognizes, that the entire program is threatened. It behooves the government officials responsible for the program to re-examine the basic premises on which the program was established so that more acceptable standards can be developed which will assure continuation of the government's significant and useful support for worthy charitable solicitation.

For the foregoing reasons, the Court finds that defendant's rejection of plaintiffs' applications to the CFC, based solely on a failure to satisfy the "direct services" requirement of section 5.21 of the Manual, must be set aside pursuant to this Court's review of agency action under the Administrative Procedure Act. Defendant shall not reject any pending or future application of plaintiffs on this ground.

As part of their relief, plaintiffs have asked for a disbursement from the 1981 CFC receipts that will compensate them for their wrongful exclusion from the 1980 Campaign. The Court declines to award this relief. There is no factual basis presented on which a reasonable sum could. be determined, and, in any event, such an award does not appear to be appropriate or equitable under the facts of this case, given that there was a genuine dispute as to the eligibility of the plaintiffs for the CFC and that there already are vested interests by other groups in the receipts.

Plaintiffs' motion for summary judgment is granted in part and denied in part; defendant's motion for summary judgment is denied. An appropriate Order is filed herewith.