HEANEY, Circuit Judge.
A grass-roots, welfare rights organization brought this action under 42 U.S.C. §§ 1983 and 1988 to gain access to the lobby of a state-operated, welfare office for the purpose of distributing written materials to and discussing welfare policy issues with welfare recipients. The district court held that the state’s exclusion of the group did not violate the First or Fourteenth Amendment. We *1077 reverse. The policy employed to decide which persons are permitted access to the lobby is vague and subject to arbitrary enforcement. For this reason, the group’s exclusion violates the First Amendment.
I. BACKGROUND
The facts of this case are essentially undisputed. After a consolidated bench trial and hearing on a request for preliminary injunction, the district court made detailed findings of fact pursuant to Federal Rule of Civil Procedure 52(a). Families Achieving Independence & Respect v. Nebraska Dep’t of Social Servs. (“FAIR”), 890 F.Supp. 860 (D.Neb.1995). We summarize below only those facts relevant to our decision.
Families Achieving Independence and Respect (FAIR) is a loosely-organized group of past and current welfare recipients providing educational support for low-income persons. Among its goals, FAIR seeks “to more fully inform the public discussion and debate on the “welfare system’ and “welfare reform.’” FAIR, 890 F.Supp. at 862 (quoting Pis.’ Ex. 3, Funding Proposal at l).[1]
The Nebraska Department of Social Services (NDSS) is a state agency that provides assistance to low-income individuals and families. NDSS maintains both a local office and a central office in Lincoln, Nebraska. Daryl Wusk is the administrator of the local NDSS office in Lincoln. The local NDSS office provides a broad range of services to welfare recipients. As Wusk explained, “Our agency is not only involved in [providing] maintenance ... like food stamps and AFDC and Medicaid, but we also are a complete service office that has child welfare and adult protective services and the whole menagerie, if you will, of Social Services programs....” Id. at 863 (quoting Tr. 132:13-23).
The local office of NDSS is located on the second floor of a commercial building owned and managed by a private company. The building management will not allow FAIR or any other group to distribute materials in the common areas of the building. Within the local NDSS office is a large, enclosed waiting and reception area (hereinafter “lobby”). The lobby is a high-traffic area of the local NDSS office. Id. It is especially busy during the first five days of the month when the agency issues food stamps to over 1,920 households “over the counter” in the reception area. Id. Throughout the month, the lobby is used by people waiting to receive food stamps as well as by clients waiting to meet with NDSS personnel in adjoining interview rooms.
NDSS has no agency policy for dealing with requests from outside groups to distribute information or otherwise engage in speech activity on NDSS property. Wusk has developed an unwritten policy to handle such requests at the local NDSS office. Ac *1078 cording to Wusk, he declines to open the lobby “up for the world”; rather, he tries “to ‘minimize the numbers of groups’ allowed access ‘as much as possible.’” Id. at 865 (quoting Tr. 120:21-22, 150:15-151:3). Wusk explained that restrictions are necessary to prevent administrative difficulties, such as congestion, and to ensure that his clients are treated with dignity and not forced to encounter individuals promoting a particular political agenda. Id. at 866. Specifically, Wusk’s policy consists of two parts: (1) only groups that provide a “direct benefit” associated with the “basic needs” of welfare recipients are allowed access to the lobby, and (2) “advocacy groups” are never allowed access regardless of the message or position advocated by the group. Id.
Over the years, Wusk has received numerous requests from groups seeking access to the lobby. Wusk has granted the requests of four groups: (1) volunteers who assisted welfare recipients in the preparation of state and federal income tax returns, (2) representatives of the Head Start Program who registered children of welfare recipients for the preschool program, (3) representatives of a food and nutrition program who distributed literature and recipes, and (4) persons who registered welfare recipients for GED and English-as-a-second-language courses at a local community college.[2] Wusk specifically turned down requests for access to the lobby by groups and institutions including a Wesleyan University social work class, the Lincoln School of Commerce, “Mad Dads” (a church-affiliated group designed to provide children with constructive activities), “Journey” (a Native American health rights organization), a “Right-To-Life” group, and various University of Nebraska research groups. Id.
To determine whether an entity making a request to use the lobby is an advocacy group — and thus excludable — Wusk explained that either a group would self-identify as an advocacy group or he would review the group’s literature to make a subjective determination about the nature of the group’s work. (Tr. 137:1-144:6.) Despite her best efforts, counsel for FAIR could not pin Wusk down on clear definitions of either “advocacy group” or a welfare recipient’s “basic needs.” With respect to the former, Wusk testified that an advocacy group is one that “promotes an issue.” (Tr. 137:21-24.) As to welfare clients’ basic needs, Wusk explained that food, clothing, and shelter certainly qualify; in the same sentence, however, he asserted that even the Lincoln Children’s Museum “addresses a psychological need” consistent with his agency’s commitment to “deal with child welfare and trying to promote some healthy families.” (Tr. 141:9-17.) Wusk also stated that he would not permit the Red Cross to use the lobby to distribute information on CPR because his “customers can live long and healthy [lives] without CPR training.” (Tr. 135:22-136:14.)
In January 1995, Stippel telephoned Suzy Skinner, Wusk’s assistant, and requested *1079 permission to have one or two FAIR members sit at a table in the lobby during the first three days of February. FAIR representatives wanted to talk to welfare recipients and distribute materials. The written materials included: (1) a brochure that explains what FAIR is, the group’s goals, and the policy issues FAIR seeks to address; (2) a flier announcing an upcoming Valentine’s Day rally at the state capítol to “Stop the War on Poor Children” co-sponsored by FAIR; and (3) a postcard designed for welfare recipients to send to their elected representatives in the names of their children urging support for measures to assist families in getting off welfare. After reviewing the materials, Skinner indicated that she did not think that there would be any problem but that she would have to discuss the matter with Wusk. 890 F.Supp. at 864-65. Wusk then reviewed the materials and denied FAIR’S request to use the lobby. Wusk stated that FAIR did not provide a direct benefit to NDSS clients. Id. at 865.
On February 1, 1995, despite Wusk’s decision, representatives from FAIR came to the lobby to talk to welfare recipients and to distribute information. Skinner again informed the group that it was not permitted to use the lobby. During this conversation, Skinner asked whether FAIR’S announcement about the upcoming rally could be placed on the bulletin board in the lobby. Id. Wusk, through Skinner, subsequently informed FAIR it would not be allowed to display the announcement on the bulletin board because it did not provide a direct benefit to welfare recipients. Id. After being informed that they would not be allowed to remain in the lobby, all members of the group left voluntarily without causing a disturbance.
FAIR brought this civil rights action pursuant to 42 U.S.C. §§ 1983 and 1988 alleging that the defendants violated their First Amendment rights to free speech and free association and their Fourteenth Amendment right to equal protection by denying them access to the lobby where other groups had been allowed to engage in similar activity. After a hearing, the district court decided in favor of the defendants. The court held that the lobby was not a public forum. Thus, FAIR’S expressive activity could be prohibited in the lobby without violating the First Amendment as long as the regulation was reasonable and not an effort to suppress expression because of opposition to the speaker’s views. The court concluded that the NDSS prohibition was reasonable because it sought to maintain the lobby as a place where social services are dispensed as opposed to a place for discussion and debate on public policy issues. FAIR appeals. We reverse.
II. DISCUSSION
Appellants do not challenge the district court’s findings of fact. Rather, FAIR challenges the district court’s legal conclusion that FAIR’S exclusion from the welfare office lobby was constitutional. Although we review the district court’s factual findings only for clear error, Fed.R.Civ.P. 52(a), where the constitutional issues present mixed questions of law and fact, our review is de novo. Gerritsen v. City of Los Angeles, 994 F.2d 570, 574 (9th Cir.) (noting that review of First Amendment questions is de novo because they present mixed questions of law and fact requiring the appellate court to apply principles of First Amendment jurisprudence to the specific facts of the case), cert. denied, 510 U.S. 915, 114 S.Ct. 306, 126 L.Ed.2d 253 (1993).
In holding that NDSS’s exclusion of FAIR from the welfare office lobby was constitutional, the district court relied heavily on its determination that the welfare office lobby was not a public forum. FAIR, 890 F.Supp. at 871. Having made that determination, the court disposed of the remaining questions—whether the prohibition was reasonable and not an effort to suppress the speakers’ activity due to disagreement with their views—in relatively short order. In this case, however, the constitutionality of FAIR’S exclusion from the welfare office turns not on the labeling of the forum, but on an analysis of the policy. We hold that the policy on its face violates the First Amendment under even the least-exacting reasonableness standard applicable to nonpublie forums. See Perry Educ. Ass’n v. Perry Local *1080 Educators’ Ass’n, 460 U.S. 37, 45-46, 103 S.Ct. 948, 954-55, 74 L.Ed.2d 794 (1983) (delineating three categories of public property and each category’s corresponding standard of review). The welfare office policy is unreasonable because it permits state officials to apply impermissibly vague criteria to distinguish between persons or groups seeking to engage in expressive activity in the lobby. See NAACP Legal Defense & Educ. Fund v. Campbell, 504 F.Supp. 1365, 1367 (D.D.C. 1981) (holding that a requirement that a charity provide “direct services” is too vague a basis on which to distinguish between groups for participation in a federally-sponsored, fund-raising campaign). Therefore, we reverse the district court without engaging in an exhaustive forum analysis and leave the question of whether the welfare office lobby is a public forum for another day. See Airport Comm’rs v. Jews For Jesus, 482 U.S. 569, 573-74, 107 S.Ct. 2568, 2571-72, 96 L.Ed.2d 500 (1987) (holding it unnecessary to reach public forum question where regulation prohibiting all First Amendment activities in airport was facially unconstitutional under overbreadth doctrine); Lebron v. National R.R. Passenger Corp. (AMTRAK), 74 F.3d 371, 372 (2d Cir.1995) (C.J. Newman, dissenting) (“[N]o matter what the scope of the forum, a governmental entity violates the First Amendment when it bars display of political messages pursuant to a ‘policy’ that [is] vague, unwritten, unclear to those who must administer it, and inconsistently applied.”), denying reh’g and amending, Lebron v. AMTRAK, 69 F.3d 650 (2d Cir.1995).
The essential, interrelated terms of the policy — “direct benefit,” “basic needs,” and “advocacy group” — are neither self-defining nor defined by the policy. On the contrary, the terms are elastic. As demonstrated by Wusk’s own testimony, it is difficult to define the terms and nearly impossible to apply them consistently. We disagree with the dissent’s contention that Wusk’s policy has been consistently interpreted and applied, Dissenting Op., infra at 1084. For example, we see no basis for a bright-line distinction between Head Start — a group that provides preschool education and socialization opportunities for poor children — and FAIR — a group that educates welfare recipients and gives them the tools to understand and participate in the legislative process as it pertains to welfare reform. Both provide a benefit to welfare recipients, and both are motivated by a desire to improve the basic living conditions of the least privileged in our society. Moreover, both are arguably advocacy groups in that both “promote issues.” We discuss application of the policy to other groups not to imply that Wusk committed any particular error, but instead to highlight that the policy necessarily requires arbitrary line drawing and yields inconsistent results.
If a governmental policy restricts protected expressive conduct, it will withstand constitutional scrutiny only if it is clear and consistently applied. NAACP Legal Defense & Educ. Fund v. Campbell, 504 F.Supp. at 1367. Two particular policies underlie this vagueness doctrine: (1) the need for notice informing those subject to a policy of its meaning, and (2) providing officials with explicit guidelines to avoid arbitrary and discriminatory enforcement. Id. The state policy fails on both counts. The policy fails to give adequate notice and confers a virtually unrestrained power on authorities to decide whether a group provides a benefit to welfare recipients. Cf. Airport Comm’rs v. Jews For Jesus, 482 U.S. at 576, 107 S.Ct. at 2573 (“The opportunity for abuse, especially where a statute has received a virtually open-ended interpretation, is self-evident.”) (citations omitted).
The dangers of a vague standard are all the more heightened where, as here, a group seeks to engage in core expressive conduct protected by the First Amendment. The Supreme Court recently observed that “handing out leaflets in the advocacy of a politically controversial viewpoint [] is the essence of First Amendment expression.” McIntyre v. Ohio Elections Comm’n, — U.S. -, -, 115 S.Ct. 1511, 1519, 131 L.Ed.2d 426 (1995); see also Albany Welfare Rights Org. v. Wyman, 493 F.2d 1319 (2nd Cir.), cert. denied, 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974) (holding that a blanket denial to welfare rights organization requesting to hand out leaflets at welfare office violated First Amendment). FAIR is a grass-roots organization designed to empow *1081 er welfare recipients and facilitate their involvement in welfare reform. To that end, FAIR wants to provide information to welfare recipients about the current welfare-reform debate and about the possible impacts of proposed legislative changes. It is well established that:
[djiseussion of public issues ... [is] integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order “to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.” Roth v. United States, 354 U.S. 476, 484 [77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498] (1957). Although the First Amendment protections are not confined to “the exposition of ideas,” Winters v. New York, 333 U.S. 507, 510 [68 S.Ct. 665, 667, 92 L.Ed. 840] (1948), “there is practically universal agreement that a major purpose of the Amendment was to protect the free discussion to governmental affairs....” Mills v. Alabama, 384 U.S. 214, 218 [86 S.Ct. 1434, 1437, 16 L.Ed.2d 484] (1966). This no more than reflects our “profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.” New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).
McIntyre, — U.S. at-, 115 S.Ct. at 1518-19. The vagueness of the state’s policy is particularly problematic in view of the fact that the policy was used to prevent FAIR from engaging in core speech.
By rejecting the approach used by the local NDSS office to control access to its lobby, we do not preclude all restrictions on the use of its welfare office lobby. The government need not permit all forms of speech on property that it owns or controls. Certainly the agency has a right, as well as a duty, to protect its clients from fraud, harassment, and undue annoyance. Safety and over-crowding also present legitimate administrative concerns. Although the policy under consideration may be well-intended, its standards are vague and it creates a substantial potential for arbitrary and discriminatory application. It follows that the policy cannot withstand First Amendment scrutiny. Therefore, we reverse the decision of the district court.

. FAIR has no membership list per se and is not incorporated. The organization’s two staff members, Sheryl Walker and Vicki Stippel, are the other named appellants in this case. Each is a welfare recipient who, for her work on behalf of FAIR, receives "scholarships” in lieu of a salary. FAIR, 890 F.Supp. at 863. FAIR finances its activities under a grant from a charitable organization. The director of the Nebraska Center for Legal Services (a special project of the Legal Aid Society, Inc. of Omaha) oversees the grant and advises FAIR with respect to the conditions of the grant and long-term organizational strategy. The primary limitation on the funds is that the money may not be used for political purposes. As a result, FAIR does not engage in activities related to partisan politics or in the direct lobbying of elected officials. (Tr. 42:4-17.)
Nonetheless, the dissent attempts to present FAIR as a highly political organization both registered as a lobbyist with the state and “allied ... with various organizations, including the Nebraska Women’s Political Network, the National Organization of Women, and the Nebraska Democratic Women_” Dissenting Op., infra at 1081. As found by the district court, FAIR was not a registered lobbyist when this case went to trial. FAIR, 890 F.Supp. at 862. FAIR briefly registered with the State of Nebraska as a lobbyist out of "an excess of caution,’’ (Tr. 39:13-14), and soon withdrew its application for registration after determining, with the assistance of the staff of the Accountability and Disclosure Commission, that FAIR was not a lobbyist (Tr. 39:19-40:22). Moreover, the extent of FAIR'S affiliation with political organizations was its co-sponsorship of a rally at the state capital. The rally was also sponsored by various day care providers; those day care providers certainly were not transformed into political groups by their mere association with the rally. In any event, our decision turns on the policy used by the welfare office to distinguish between organizations appealing to use the facilities, not on the exact nature of FAIR'S political leanings.

. Stippel testified that, in addition to the listed groups, she had seen Girl Scouts using the lobby of the local NDSS office in the past. (Tr. 80:23-81:7.) The district court, however, credited Wuslt's testimony whereby he "specifically denied allowing the Girl Scouts access to the [lobby] to hand out materials.” 890 F.Supp. at 866, n. 4. Wusk’s actual testimony illustrates not only his poor memory of this matter, but also some of the problems inherent in enforcing a policy like Wusk’s:
A. [Wusk:] We have probably had Girl Scouts on the premises, but X don't believe that they— that I recall ever set up a table to sign up and do those kinds of things. We have groups come in once in a while and bring us or come in to see the office and do little mini tours and things, but they may have come that way, but I don’t remember that they came in and did a table.
Q. Is it possible that somebody could have set up [a table] in the office area at sometime without your knowledge?
A. That is possible.
Q. Had you known that the Girl Scouts wanted to come on the premises and access clients for the purpose of soliciting membership, would you have allowed that to happen?
A. No.
(Tr. 124:16-125:4.)
Although the district court might have been more accurate had it characterized Wusk as having denied that he remembered giving the group access, we do not disturb the court’s factual finding that the Girl Scouts were never permitted to distribute materials or solicit membership in the lobby.