No. 96-3645

Jay B. Marcus; Marcus For            *
Congress, a political committee;*
The Natural Law Party of Iowa,       *
a political committee; Edward T.*
Rusk, of the Working Class           *
Party; Michael Cuddehe; Michael      *
Dimick; Rogers Badgett; Peter        *
Lamoureux; Fred Gratzon; Susan       *
Marcus,                              *
                                     *
        Appellants,                  *
                                     *   Appeal from the United States
    v.                               *   District Court for the
                                     *   Southern District of Iowa.
Iowa Public Television, a state      *
agency; Daniel K. Miller, in         *
official capacity,                   *
                                     *
        Appellees.                   *

_____

ORDER

Filed:  October 11, 1996
_____

Before FAGG, MAGILL, and BEAM, Circuit Judges.

_____

MAGILL, Circuit Judge.

        Jay B. Marcus, Marcus for Congress; The Natural Law Party of Iowa,
Edward T. Rusk, of the Working Class Party; Michael Cuddehe; Michael
Dimick; Rogers Badgett; Peter Lamoureux; Fred Gratzon; and

Susan Marcus (Movants)[1] sought equitable relief against Iowa Public Television and one of its officials (IPTV) in the district court.[2] IPTV had scheduled "joint appearances" of Democratic and Republican candidates for United States Representative for each of Iowa's five congressional districts on its program Iowa Press. Movants sought injunctive relief requiring IPTV to "include all legally qualified candidates in the joint appearances," Compl. at 10, as well as other injunctive and declaratory relief. The district court denied a preliminary injunction and, following a trial before the court and an advisory jury,[3] denied permanent injunctive relief. Movants' appeal of this denial of injunctive relief is pending before this Court.

IPTV has two scheduled joint appearances still to be broadcast. On Sunday, October 13, 1996, the Democratic and Republican candidates for United States Representative for Iowa's First Congressional District will appear on Iowa Press, and on

---

[1]Jay B. Marcus is the Natural Law Party of Iowa (NLP) candidate for United States Representative in Iowa's Third Congressional District; Rusk is the Working Class Party candidate for United States Representative in Iowa's Third Congressional District; Cuddehe is the NLP candidate for United States Representative in Iowa's First Congressional District; Dimick is the NLP candidate for United States Representative in Iowa's Fifth Congressional District; Badgett in the NLP candidate for United States Representative in Iowa's Fourth Congressional District; Lamoureux is the NLP candidate for United States Representative in Iowa's Second Congressional District; Gratzon is the NLP candidate for the United States Senate in Iowa; and Susan Marcus is a registered voter in Iowa who wishes to see these aforementioned political candidates debate with Democratic, Republican, and other qualified congressional candidates on the Iowa ballot.

[2]The Honorable Charles R. Wolle, United States District Judge for the Southern District of Iowa.

[3]Although seeking only equitable relief, the Movants filed a jury demand with the district court on September 27, 1996. The district court impaneled a jury "[w]ithout deciding whether the case presented issues properly triable to a jury," Mem. Op. at 2, and the district court made "the same findings [as the jury] based on its independent consideration of the evidence." Id. at 4.

Sunday, October 20, 1996, the Democratic and Republican candidates for United States Representative for Iowa's Fourth Congressional District will appear on Iowa Press. Movants have brought this motion for emergency injunctive relief before this Court, requesting that IPTV be enjoined from broadcasting these joint appearances "unless all legally qualified candidates are permitted to participate on an equal basis." Emergency Mot. at 1. Because we conclude that injunctive relief is not warranted at this point in this case, we deny the motion.

**I.**

IPTV is an Iowa state actor, and is governed under the provisions of Iowa Code § 256.80-256.90. IPTV produces and broadcasts Iowa Press, a "30-minute news and public affairs program [which] airs twice each Sunday at noon and 7:00 p.m." Movants' App. at 14. Beginning on September 22 and running for a total of five weeks, Iowa Press scheduled "co-appearances by the major candidates seeking to represent Iowa's five congressional districts in the Iowa delegation in Washington D.C." Id. The major candidates were all Democrats or Republicans. Under the program's format, a host and a team of political reporters ask questions of the candidates, who would have an opportunity to present their views to the audience.

Movants made repeated requests to IPTV that they be allowed to participate in the joint appearances. IPTV declined to allow other candidates to participate in the scheduled joint appearances, concluding that they were not newsworthy. IPTV did offer to include Movants and other candidates to present their views on other programs presented by the network. Dissatisfied with this offer, Movants brought suit against IPTV for injunctive and declaratory relief on September 13, 1996. The district court denied Movants' motion for preliminary injunctive relief on September 24, 1996, holding that they had failed to demonstrate

irreparable harm and that they did not establish a likelihood of success on the merits.[4]  Trial was set for September 30, 1996, and a jury was impaneled.

After the presentation of evidence, including witness and expert witness testimony, the jury returned a special verdict with a series of interrogatories.  Based on an independent review of the evidence, the district court adopted the jury's findings, and made additional findings. The district court found that, although not intended by IPTV to be "debates," the scheduled joint appearances

_____

[4]The district court found that:

> Plaintiffs have not proved irreparable harm or that on balance the harm they would suffer would outweigh the harm caused by granting an injunction.  There is no showing in this record that their scheduled appearances on Iowa Public Television programs other than "Iowa press" would be less valuable to them.  Voter attention given to a program aired closer to the time of the elections may well have a more favorable impact on voters than a presentation on the Iowa Press programs now planned.  On balance, an injunction's harm to the exercise of defendants' journalistic discretion would outweigh any harm plaintiffs might suffer from not appearing on the planned Iowa Press shows.

> Plaintiffs have not established a likelihood of success on the merits.  The question of whether or not the planned Iowa Press programs featuring political candidates will constitute a debate under Forbes v. Arkansas Education Television Commission, [93 F.3d 497 (8th Cir. 1996) (Forbes II)], is a very close one.

> The public has an interest in hearing the views of all legally qualified candidates.  But the record here is that all candidates' views can adequately be presented on Iowa Public Television programs without requiring the requested appearances with other candidates on the scheduled Iowa Press programs. Moreover, there is a very strong public interest in allowing news broadcast journalists to exercise editorial discretion.

Order at 1-2.

-4-

would be interpreted by reasonable persons viewing <u>Iowa Press</u> to be debates.

The district court also found that the <u>Iowa Press</u> programs were "bona fide news interview programs." Mem. Op. at 3. The district court noted that

> defendant network has been airing weekly <u>Iowa Press</u> appearances of public figures for over twenty years. The typical programs are not debates but simply journalists' interviews of persons in the news generally.

<u>Id.</u> at 5. The district court found that Movants had been excluded from the joint appearances "on the basis of independent journalistic and editorial judgments" by IPTV that the Movants were not newsworthy, <u>id.</u> at 4, and specifically held that Movants had failed to prove that their appearance on <u>Iowa Press</u> would be newsworthy. <u>Id.</u> The district court also held that IPTV did not base its decision to include certain candidates in the joint appearances based on the candidates' political affiliation, and that Movants were not excluded from the joint appearances based on their political affiliation or on the basis of their political views.

Based on these findings, the district court concluded that the <u>Iowa Press</u> programs constituted a limited public forum, but that Movants' exclusion from the programs did not violate the First Amendment. IPTV served a compelling state interest, defined by IPTV's policies, by limiting the joint appearances to newsworthy candidates. The district court further held that the exclusion was narrowly tailored because, although not invited to appear on <u>Iowa Press</u>, Movants did have access to other programs presented by IPTV. The district court denied all relief, and Movants appealed. During the pendency of the appeal, Movants brought this motion before us.

## II.

We begin by noting that, while we are not unmindful of the time constraints faced by the Movants, principles of judicial economy, equity, and respect for the judgment of the district court do not favor granting Movants their requested relief at this stage of the proceedings. Movants' appeal of the district court's denial of injunctive relief is currently pending before this Court, and it will require an analysis of much the same issues as presented in this motion. Indeed, in this motion Movants request substantially the same relief which they sought--and failed to obtain--in the district court, and which they undoubtedly will seek on appeal. This Court will therefore be required by Movants to expend our resources twice in considering the same issues between the same parties in the same case--a duplicative effort which is particularly undesirable in light of our ever-expanding docket.

In addition to requiring this Court to expend additional resources, motions such as this can be used to gain an unfair advantage over the other party litigant. In considering Movants' motion for emergency injunctive relief, we have before us to balance the Movants' arguments only a hastily prepared response by IPTV, a smattering of the record, and virtually no opportunity for reflection. By contrast, on appeal IPTV will have a full opportunity to rebut Movants' arguments, and to support the district court's judgment. Further, we will have full access to the record in this matter, and sufficient time to carefully consider the legal arguments of all parties. This assures not only fairness to all parties litigant, but also that we will not intemperately--and incorrectly--reverse the carefully wrought judgment of the district court.

Our analysis of Movants' request for injunctive relief is guided by our decision in Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc), where we stated:

> Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

We address each of these issues in turn.

## A.

The two remaining joint appearances scheduled on Iowa Press concern the First and Fourth Congressional District races. Only Movants Cuddehe and Badgett, the candidates for those races, would be directly affected by the grant of the requested injunctive relief. We therefore direct our inquiry into irreparable harm to these two Movants.

We agree with the district court that the access offered to these Movants on other IPTV programs will be of significant value to the Movants, and might well have a more favorable impact on voters than the earlier airing of Iowa Press. See Order at 2. But see Trial Tr. at 73, reprinted in Movants' App. at Ex. G (expert testimony of Professor Mack Shelley that appearance in a debate is more valuable than a postdebate appearance). We disagree, however, that these Movants have failed to show irreparable harm.

Movants in this motion argue that their First Amendment right to express themselves in a limited public forum has been offended by their exclusion from the joint appearances on Iowa Press. If they are correct and their First Amendment rights have been violated, this constitutes an irreparable harm. See, e.g., Elrod v. Burns, 427 U.S. 347, 373 (1973) (plurality opinion) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). This element of the Dataphase analysis is therefore satisfied.

## B.

We agree with the district court, however, that the balance of harms in this case weighs against issuing an injunction. Although a state actor, IPTV is a media organization, which necessarily must make editorial decisions regarding the content of its programming. Interference with that editorial discretion constitutes a significant injury to the editorial integrity of IPTV, which interferes with their primary mission of serving the public. See
Mem. Op. at 7.

In addition, IPTV has represented that, if required to include other candidates in the Iowa Press joint appearances, it will cancel the scheduled joint appearances entirely "rather than impair its journalistic integrity and its credibility with its viewers." Mem. in Opposition to Emergency Mot. at 3. We note that this is precisely the step taken by the Nebraska Education Television Network in August 1996, when it cancelled a scheduled debate between certain senatorial candidates rather than include uninvited candidates or face litigation. We find that the threat of possible harm to IPTV is substantial if the requested injunction were to issue, and is greater than the harms faced by Movants.

## C.

We also do not believe that Movants have demonstrated a likelihood of success on the merits. In this case, "success on the merits" means that we would reverse the district court on appeal. We do not lightly assume district court error, particularly where, as in the appeal pending before this Court, the district court's judgment shall be reviewed for abuse of discretion. See Pottgen v. Missouri State High Sch. Activities Ass'n, 40 F.3d 926, 929 (8th Cir. 1994).

-8-

Accepting for the purposes of this motion that the joint appearances are debates and that IPTV has opened <u>Iowa Press</u> as a limited public forum to qualified congressional candidates, <u>see</u> Mem. Op. at 5-6, IPTV's regulation of speaker access "survive[s] only if [it is] narrowly drawn to achieve a compelling state interest." <u>International Soc'y for Krishna Consciousness, Inc. v. Lee</u>, 505 U.S. 672, 678 (1992).

IPTV presented evidence, and the district court found, that IPTV limited speaker access to the joint appearances on <u>Iowa Press</u> on the basis of the newsworthiness of the candidates. The district court held that IPTV had a compelling interest in presenting newsworthy programs, stating that:

> It is profoundly important that the defendant network and its new editors be allowed to exercise independent journalistic and editorial judgments based on newsworthiness. If the defendant network may not exercise editorial discretion in determining the content of its programs, the network would be fundamentally bland and of little value to the public it serves.

Mem. Op. at 7.

Movants argue that IPTV has no compelling interest in limiting speaker access, and rely heavily on our decision in <u>Forbes v. Arkansas Educational Television Commission</u>, 93 F.3d 497 (8th Cir. 1996) (<u>Forbes II</u>). In <u>Forbes II</u>, we held that an independent candidate could not be excluded from a debate broadcast on a state-operated public television station because he was not a "viable" candidate. <u>See</u> <u>id.</u> at 504-05. Reasoning that Arkansas law itself defined "viability" as being qualified as a candidate, we determined that the independent candidate had been excluded from the debate only because "in the opinion of the network, he could not win." <u>Id.</u> at 504. Relying on <u>Families Achieving Independence and Respect v. Nebraska Department of Social Services</u>, 91 F.3d 1076

(8th Cir. 1996), a decision which has recently been vacated pending rehearing by the Court en banc, the Forbes II Court stated that:

> We have no doubt that the decision as to political viability is exactly the kind of journalistic judgment routinely made by newspeople. We also believe that the judgment in this case was made in good faith. But a crucial fact here is that the people making this judgment were not ordinary journalists: they were employees of government. The First Amendment exists to protect individuals, not government. The question of political viability is, indeed, so subjective, so arguable, so susceptible of variation in individual opinion, as to provide no secure basis for the exercise of governmental power consistent with the First Amendment.

93 F.3d at 505. Movants reason that, because this case also involves the exclusion of a candidate based on a "subjective" determination of newsworthiness, see Trial Tr. at 296 (testimony of Mike Newell, Producer for Iowa Press), it must also be an improper exercise of governmental authority. We disagree.

Forbes II cannot be read to mandate the inclusion of every candidate on the ballot for any debate sponsored by a public television station. Nor does Forbes II suggest that public television station administrators, because they are government actors, have no discretion whatsoever in making broadcast determinations. Rather, Forbes II held that there was no compelling interest in excluding statutorily-defined viable candidates from a debate based on the viability of the candidate. Unlike "viability," which is ultimately for the voters to decide, "newsworthiness" is peculiarly a decision within the domain of journalists.

Relying on Regan v. Time, Inc., 468 U.S. 641 (1984), Movants assert that "newsworthiness" is an inherently improper basis for

determining access.[5]  Regan involved criminal statutes for photographing obligations or securities of the United States, see id. at 643, and we agree that the "newsworthiness" of a message could not be a proper basis for determining whether a speaker should be criminally liable for speech. In the instant case, however, we deal with a government agency which is also a media organ.  By its very nature and under controlling policies, IPTV must be concerned with the newsworthiness of the issues and speakers included in its programming.  Pursuant to Iowa Code § 256.82(3), IPTV's advisory committee on journalistic and editorial integrity is "governed by the national principles of editorial integrity developed by the editorial integrity project."  Id.  "Editorial integrity in public broadcasting programming means the responsible application by professional practitioners of a free and independent decision-making process which is ultimately accountable to the needs and interests of all citizens."  Statement of Principle of Editorial Integrity in Public Broadcasting, the Editorial Integrity Project, reprinted in Respondents' App. at Ex. 4 (Statement of Principles).  The Statement of Principles provides that:

---

[5]The Regan Court stated:

A determination concerning the newsworthiness or educational value of a photograph cannot help but be based on the content of the photograph and the message it delivers.  Under [18 U.S.C. §§ 474, 504(1)], one photographic reproduction will be allowed and another disallowed solely because the Government determines that the message being conveyed in the one is newsworthy or educational while the message imparted by the other is not.  The permissibility of the photograph is therefore often dependent solely on the nature of the message being conveyed.  Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment.

468 U.S. at 648-49 (quotations and citation omitted).

> In order to assure that programs meet the standards of editorial integrity the public has a right to expect, the following five principles and guidelines establish a foundation for trustee action. . . . The ultimate goal of the principles and guidelines is to assist public broadcasting trustees in fulfilling their vital role in this important public service.

Id.  These five principles are: (I) We are Trustees of a Public Service; (II) Our Service is Programming; (III) Credibility is the Currency of our Programming; (IV) Many of our Responsibilities are Grounded in Constitutional or Statutory Law; and (V) We Have a Fiduciary Responsibility for Public Funds.  Id.  The guideline to Principle III, Credibility is the Currency of our Programming, instructs that:

> The process of developing programs to meet the audience's needs must function under clear policies adopted and regularly reviewed by the trustees.  This process must be managed by the professional staff according to generally accepted broadcasting industry standards, so that the programming service is free from pressure from political or financial supporters.  The station's chief executive officer is responsible for assuring that the program decisions are based on editorial criteria, such as fairness, objectivity, balance and community needs; not on funding considerations.

Id.  In adhering to these guidelines, IPTV has created a programming policy, which provides that:

> In the presentation of public affairs programming, Iowa Public Television should maintain maximum objectivity and fairness. Iowa Public Television should strive for a better informed citizenry of the state of Iowa, through the presentation of important and significant issues.

Resp't's App. at Ex. 3 (emphasis added).

In meeting these policies, IPTV has limited access to the Iowa Press joint appearances to newsworthy candidates.  Although a

-12-

determination of newsworthiness is based on journalistic discretion, and is therefore somewhat subjective, there are clearly objective elements of newsworthiness.  Daniel K. Miller, the Director of Programming and Production for IPTV, testified at length in his deposition to the elements which inform a professional editorial judgment that a candidate's appearance is "newsworthy":

> [N]ewsworthiness has a number of elements, I think.  Is this candidate or this campaign, is it active in the region that it's running for?  If it's a statewide campaign, for example, is it active in all of Iowa's 99 counties or in a majority of them?  Does it have--my phrase, not a good one--an organization of volunteers, campaign organization beyond the campaign staff?  If the candidate or campaign or party has had previous exposures to elective offices, how have they done?  If they have done well, what is well?  Are they growing?  Is there growth in their success at the polls?  Have they had previous exposure to elective office?  Are they seeking the office actually to be elected to it or do they say that they are seeking it to bring ideas into the marketplace?  How has their fund-raising been?  Is it a broad base?  Do they have a lot?  Do they have little?  Whatever.  How are they treated by other media organizations?  Have their efforts generated news in other media organizations or if there are debates, have they been included in those debates by other news organizations?  What are we hearing?  What are we hearing either from the public or what are we hearing from the campaigns themselves?  Are people calling us and saying you know, "Such and such had a crowd of 550 last night," or are they calling us and saying, "Such and such had a crowd of five."  The last part, are we hearing anything?  What are we hearing from the campaigns themselves?  Politics is an enterprise that relies on the ability of its participants to sell themselves, to retail themselves.  What are we hearing along that line?  Do we hear a lot from the candidates themselves?  Are they calling us?  Are they faxing us?  Are we getting encouraged by their supporters who happen to be people we know or people we don't know to pay attention to their campaigns?  Do we see early indications of retail efforts in that regard in the media?  Are they buying newspaper or radio ads?

Dep. at 22-24, reprinted in Movants' App. at Ex. C. Professor Barbara Mack, an expert witness for IPTV, testified regarding journalistic standards of newsworthiness:

> When I teach freshmen journalists about what is meant by newsworthiness, what makes someone newsworthy, you talk about the--the quality that that person or that news event has.
>
> Is that news event going to have an impact on the people who read your newspaper or who watch your television station? Is it going to change their lives? Does it have the potential to change their lives? Is it something which is a public conflict? Conflict is one of our classic new values. Impact is a classic news value.
>
> We talk about the news--the news value of locality. As strange as it may seem, a bus accident that occurs in India will get very little coverage in the Des Moines Register, but a bus accident that occurs in downtown Des Moines at rush hour, even though it may injure fewer people, will get more new coverage. Why? Because it's local, and local news has importance.
>
> We talk about the value of human interest, and many of the stories that most people think of as feature stories are human interest stories. They appeal to the characteristics of the human spirit.
>
> So when a journalist is making a decision about what is or is not news, there is always a very careful evaluation of each of those factors.

Trial Tr. at 355-56.

As found by the district court, IPTV properly determined that none of the Movants were newsworthy, see Mem. Op. at 4. The district court found that:

> Defendants properly took into account in determining newsworthiness . . . their study of the feeble efforts of the plaintiff candidates to raise funds or express efforts in their campaigns to generate public support for their candidacies.

<u>Id.</u> at 8-9.

We agree that IPTV has a compelling interest, in meeting its public service goals, of limiting access to newsworthy candidates. We further agree that its methods were narrowly suited to achieving this goal, and left substantial access to other fora offered by IPTV. We therefore do not believe that Movants have demonstrated a likelihood of success on the merits.

**D.**

We agree with the district court that there is a public interest in hearing all qualified candidates present their views. However, there is also a public interest in having a debate between some candidates rather than having no debate whatsoever. In addition, we believe that IPTV's professional broadcasters are generally better aware of what constitutes appropriate programming than a group of federal judges; it is clearly in the public interest in having a state-operated public television free of unnecessary interference by a federal court. On balance, therefore, we believe that the public interest supports denying this injunction.

**III.**

For the reasons stated above, we deny the emergency motion for injunctive relief.

BEAM, Circuit Judge, dissenting.

The court (and the district court as well) seeks to distinguish the indistinguishable. Thus, I dissent.

The binding precedent at work in this case is found in <u>Forbes v. Arkansas Educ. Television Comm'n</u>, 93 F.3d 497 (8th Cir. 1996).

-15-

Forbes (as are the plaintiffs in this case) was a legally qualified candidate for Congress from the Third District of Arkansas. Also, as here, he was shut out of a debate between the Republican and Democratic candidates for the Third District seat televised on Arkansas Educational Television. The basis for the exclusion was that Forbes was not a "viable" candidate.

Chief Judge Richard S. Arnold, for a unanimous panel, rejected, as unconstitutional, this governmental action, saying:

> We have no doubt that the decision as to political viability is exactly the kind of journalistic judgment routinely made by newspeople. We also believe that the judgment in this case was made in good faith. But a crucial fact here is that the people making this judgment were not ordinary journalists: they were employees of government. The First Amendment exists to protect individuals, not government. The question of political viability is, indeed, so subjective, so arguable, so susceptible of variation in individual opinion, as to provide no secure basis for the exercise of governmental power consistent with the First Amendment.

Id. at 505.

In my view, there can be no realistic argument advanced that a subjective opinion by a government employee that a candidate is or is not "newsworthy" is different from a subjective conclusion that he or she is or is not "politically viable." The inquiry involves two peas from the same analytical pod. Forbes requires us to grant the emergency injunction requested in this case.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-16-