HEANEY, Circuit Judge,
with whom MeMILLIAN, MORRIS SHEPPARD ARNOLD, and MURPHY, Circuit Judges, join,
dissenting.
I respectfully dissent. I do not believe that a state should be permitted to exclude a grass-roots, welfare-rights organization from engaging in speech activity in a welfare office lobby because of a low-level administrator’s determination that the group does not provide a “direct benefit” to the welfare office’s clientele. The constitutionality of FAIR’S exclusion turns not on a labeling of the forum, but rather on the policy employed to decide which groups will have access to the lobby. That policy — as explained to FAIR at the time of its exclusion and as subsequently officially adopted by the NDSS — violates the First and Fourteenth Amendments under even the least-exacting reasonableness test in that it permits state officials to apply imper-missibly vague criteria to distinguish between persons seeking to engage in speech activity on state property. See NAACP Legal Defense & Educ. Fund v. Campbell, 504 F.Supp. 1365, 1367 (D.D.C.1981) (policy requiring a charity to provide “direct services” too vague to distinguish between groups for participation in a federally-sponsored fund-raising campaign). Because such a policy violates the First and Fourteenth amendments on its face, regardless of the forum to which it is applied, I would reverse the district court and leave the question of whether the welfare office lobby is a public forum for a another day. See Airport Comm’rs v. Jews for Jesus, 482 U.S. 569, 573-74, 107 S.Ct. 2568, 2571-72, 96 L.Ed.2d 500 (1987) (unnecessary to reach the public forum question because regulation prohibiting all First Amendment activities in airport was facially unconstitutional under the overbreadth doctrine); Lebron v. National R.R. Passenger Corp. (Amtrak), 89 F.3d 39, 41 (2d Cir.1996) (C.J. Newman, dissenting) (“[N]o matter what the scope of the forum, a governmental entity violates the First Amendment when it bars display of political messages pursuant to a ‘policy’ that [is] vague, unwritten, unclear to those who must administer it, and inconsistently applied.”), denying reh’g and amending, Lebron v. Amtrak, 69 F.3d 650 (2d Cir.1995).
The majority adopts the district court’s finding that the policy used by Wusk to guide his decision to exclude FAIR from the lobby included a per se ban on admitting advocacy groups. Majority Op., supra, at 1412 (citing FAIR, 890 F.Supp. at 865-66). While I have little doubt that a welfare office could ban advocacy groups using its facilities to advance specific political agendum without offending the First Amendment, that simply is not this ease. As stipulated by the parties, the only reason Wusk did not allow FAIR representatives to be present in the lobby and distribute pamphlets like other groups had done in the past was because Wusk determined that FAIR did not provide a “direct benefit” to welfare recipients. (Pis.’ Ex. 1 (“Stipulation of Uncontroverted Facts”) at ¶ 15.) Similarly, Mary Dean Harvey, Director of NDSS makes no mention of a departmental position regarding “advocacy groups” in her subsequent affirmance of Wusk’s actions and adoption of the policy. (See Defs.’ Ex. 3 (Aff. of Mary Dean Harvey.)) [22] True, Wusk provided a more complex rationale for his decision at the time of trial, but this after-the-fact explanation car *1425 ries little weight in light of the clear record that the Department’s decision turned entirely on an assessment of the benefits associated with FAIR’S message.
Thus, the question presented is whether the First and Fourteenth Amendments permit state officials to distinguish between groups given access to a welfare office based on whether the group provides a “direct benefit” to welfare recipients. If a governmental policy restricts protected expressive conduct, it will withstand constitutional scrutiny only if it is clear and consistently applied. NAACP Legal Defense & Educ. Fund, 504 F.Supp. 1365, 1367 (D.D.C.1981).[23] Two particular concerns underlie the vagueness doctrine: (1) the need to give notice of its meaning to those subject to the policy, and (2) providing officials with explicit guidelines to avoid arbitrary and discriminatory enforcement. Id. The welfare office policy fails on both counts. I agree with the district court that there is no evidence on this record to suggest that Wusk or anyone at NDSS intentionally discriminated against FAIR based on the group’s message. FAIR need not demonstrate actual discrimination, however, where the potential for discrimination is significant. See Forsyth County, Georgia v. The Nationalist Movement, 505 U.S. 123, 128, 112 S.Ct. 2395, 2400-01, 120 L.Ed.2d 101 (1992) (“It is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable.”). The constitutional infirmity here derives from the policy’s imprecision: it confers virtually unrestrained power on authorities to define what constitutes a direct benefit to welfare recipients. See Airport Comm’rs v. Jews for Jesus, 482 U.S. 569, 576, 107 S.Ct. 2568, 2573, 96 L.Ed.2d 500 (1987) (“The opportunity for abuse, especially where a statute has received a virtually open-ended interpretation, is self-evident.”).
It simply cannot be said that there are any narrowly drawn, reasonable or definite standards guiding Wusk’s decisionmaking. According to his testimony at trial, Wusk reviews the literature from a group requesting access to the lobby and makes a subjective determination about the nature of the group’s work. (Trial Tr. 137:1-144:6.) Despite her best efforts, counsel for FAIR could not pin Wusk down on clear definitions of either “advocacy group” or a welfare recipient’s “basic needs,” the two additional concepts he introduced at trial to explain his process for deciding who can speak to welfare recipients. With respect to the former, Wusk testified that an advocacy group is one that “promotes an issue.” (Trial Tr. 137:21-24.) As to welfare clients’ basic needs, Wusk explained that food, clothing, and shelter certainly qualify; in the same sentence, however, he asserted that even the Lincoln Children’s Museum “addresses a psychological need” consistent with his agency’s commitment to “deal with child welfare and trying to promote some healthy families.” (Trial Tr. 141:9-17.) Moments before, in the same discussion, however, Wusk explained that he would not permit the Red Cross to use the lobby to distribute information on CPR because his “customers can five long and healthy [lives] without CPR training.” (Trial Tr. 135:22-136:14.) Wusk’s statements demonstrate the elasticity in the policy which he is left to administer at his whim.
I disagree with the majority’s assertions that Wusk’s policy has been applied consistently in practice. (Majority Op., supra, at 1416, 1417.) I see no basis for a bright-line distinction between several of the groups *1426 permitted access to the lobby and FAIR: For example, Wusk allowed in-person registration for Head Start, a program with broad goals including “providing family-centered services for low-income families with very young children designed to promote the development of the children, and to enable then-parents to fulfill their roles as parents and to move toward self-sufficiency” 42 U.S.C. § 9840a(a)(l) (1994). Wusk also permitted the YWCA to post a brochure about parenting classes and the Lincoln Children’s Museum to announce free admission for low-income families. (Defs.’ Ex. 1, Attch. 3.) These programs, like FAIR, aim to make welfare recipients more informed citizens, better prepared to raise children, and more full participants in society. By mentioning the policy as applied to these other groups, I in no way intend to suggest that their missions are unworthy or that Wusk erred in giving any particular group access to his clientele. Instead, I believe the comparison highlights the arbitrary line-drawing and inconsistent application inherent in the “direct benefit” policy.
The majority accepts that the concept “direct benefit” has concrete parameters entailing an offer of a tangible good, service, or educational or employment opportunity to NDSS families. (Majority Op., swpm, at 1417.) But what constitutes a service to welfare recipients? What is an educational opportunity? Would it not be a service and educational opportunity to obtain information about reforms to the laws governing economic assistance for the poor? Wusk’s own assistant, who received FAIR’S request, believed FAIR offered a direct benefit to welfare recipients and told Stippel that she did not believe there would be a problem with FAIR’S request to use the lobby. (Pis.’ Ex. 1 (Stipulation of Uneontroverted Facts) at ¶ 13.) It was only after she consulted Wusk that his assistant understood that FAIR did not qualify for admission under Wusk’s interpretation of the policy.
The dangers of a vagué standard are all the more heightened where, as here, a group seeks to engage in core expressive conduct protected by the First Amendment. The Supreme Court recently observed that “handing out leaflets in the advocacy of a politically controversial viewpoint [] is the essence of First Amendment expression.” McIntyre v. Ohio Elections Comm’n, 514 U.S. 334, 346-48, 115 S.Ct. 1511, 1519, 131 L.Ed.2d 426 (1995); see also Albany Welfare Rights Org. v. Wyman, 493 F.2d 1319 (2nd Cir.), cert. denied, 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974) (a blanket denial to welfare rights organization requesting to hand out leaflets at welfare office violates the First Amendment). FAIR is a grass-roots organization, established by two women on welfare, designed to educate welfare recipients and give them a voice in welfare reform. FAIR wanted to provide information about the current welfare-reform debate and about the impact of proposed legislative changes. It is well established that:
[djiscussion of public issues ... [is] integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order “to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.” Roth v. United States, 354 U.S. 476, 484 [77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498] (1957). Although the First Amendment protections are not confined to “the exposition of ideas,” Winters v. New York, 333 U.S. 507, 510 [68 S.Ct. 665, 667-68, 92 L.Ed. 840] (1948), “there- is practically universal agreement that a major purpose of the Amendment was to protect the free discussion to governmental affairs____” Mills v. Alabama, 384 U.S. 214, 218 [86 S.Ct. 1434, 1437, 16 L.Ed.2d 484] (1966). This no more than reflects our “profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.” New York Times v. Sullivan, 376 U.S. 254 [84 S.Ct. 710, 11 L.Ed.2d 686] (1964).
McIntyre, 514 U.S. at 346-47, 115 S.Ct. at 1518-19. Although the government need not permit all forms of speech on property that it owns and controls, it is nonetheless significant that NDSS’s exclusion of FAIR burdened core speech.
Finally, I note that while I would reject the particular approach employed by NDSS to control speech activity on its premises, I would in no way preclude all restrictions on the use of its welfare office lobby. Certainly *1427 the agency has a right — as well as a duty — to protect its clients from fraud, harassment, and undue annoyance. Safety, over-crowding, and other administrative constraints[24] present legitimate concerns which the state may address with a reasonable, clear, and consistently-applied policy to control access to its facilities. Enforcement of a vague “direct benefit” requirement, however, in no way addresses those legitimate concerns and constitutes a practice that should not withstand constitutional scrutiny.

. Harvey, who is ultimately responsible for all internal agency policies, states:
[I]n late January 1995, I had communication with ... Daiyl Wusk[] regarding a request that he had received from a group calling itself "FAIR” to come to the District Office proper and distribute literature and engage in discussion with our clients[.]
Mr. Wusk informed me of his tentative decision to reject the request on the basis that only groups who offer a direct service or benefit to our clients are allowed on our office premises ... and I concurred with that decision as the appropriate statement of our current policy on this issue[.]

[T]he policy of the Department of Social Services is that no person or group should be allowed to come into our offices proper for the purpose of distributing literature, soliciting or otherwise engaging clients in discussion unless that person or group is offering a direct service or benefit to our clientsf.]

(Defs.’ Ex. 3 (Aff. of Mary Dean Harvey) at ¶¶ 2-3, 5 (emphasis added).) Although the majority acknowledges both the reason given by Wusk for FAIR'S exclusion and Harvey’s subsequent statements, (Majority Op., supra, at 1414), it nonetheless adopts the district court’s expansive version of the policy without explanation.

. I recognize that the void-for-vagueness doctrine developed in relation to criminal laws where the potential chilling effect on protected activity brought by an under-defined regulation and loosely-controlled governmental enforcement is most heightened. See generally Rotunda & Nowak, Treatise on Constitutional Law: Substance and Procedure § 20.9 (2d ed. 1992). Accordingly, courts employ a more tolerant vagueness test to purely economic regulations. Fogle v. THORN Americas, Inc., 95 F.3d 645, 650 (8th Cir.1996) (citing Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498-99, 102 S.Ct. 1186, 1193-94, 71 L.Ed.2d 362 (1982)). Although the policy at issue here did not subject FAIR to criminal sanctions, it constituted the state’s basis for regulating core expressive conduct and should be judged under a stringent vagueness test. See Forsyth County, Georgia v. The Nationalist Movement, 505 U.S. 123, 128-29, 112 S.Ct. 2395, 2400-01, 120 L.Ed.2d 101 (1992) (county assembly and parade ordinance that permitted government administrator to vary the fee for assembling to reflect the estimated cost of maintaining public order held facially unconstitutional).

. As the majority points out to make a different point, the local welfare office may face particular constraints because it is a voter registration site where state law prohibits the display or distribution of “materials advocating or advertising any political issue, candidate, or party.” (Majority Op., supra, at 1416-17 n. 15) (quoting Neb.Rev. Stat. § 32-307 (1995).)