# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 95-2891

_____

| | | |
|---|---|---|
| Families Achieving Independence and Respect; Sheryl Walker; Vicki Stippel, | * * * * | |
| Appellants, | * * | |
| v. | * * * | Appeal from the United States District Court for the District of Nebraska. |
| Nebraska Department of Social Services; Mary Dean Harvey; Ann Hogan; Daryl Wusk; Suzy Skinner, | * * * * * | |
| Appellees. | * * | |

_____

Submitted: January 14, 1997

Filed: May 2, 1997

_____

Before RICHARD S. ARNOLD, Chief Judge, HEANEY, McMILLIAN, FAGG, BOWMAN, WOLLMAN, MAGILL, BEAM, LOKEN, HANSEN, MORRIS SHEPPARD ARNOLD, and MURPHY, Circuit Judges, en banc.

_____

MAGILL, Circuit Judge.

Members of Families Achieving Independence and Respect (FAIR), a grassroots welfare rights organization, sought to post materials, distribute materials, and speak with welfare recipients in the lobby of the Nebraska Department of Social Services' (NDSS) Lancaster County local office in Lincoln, Nebraska (Local Office). FAIR was denied access to the Local Office, and FAIR sought injunctive relief under 42 U.S.C. §§ 1983 and 1988 in the district

court.[1]  The district court denied relief, concluding that FAIR's First and Fourteenth Amendment rights were not violated because: (1) the Local Office's policy was not vague; (2) the Local Office was not a public forum; (3) the Local Office's regulation of expressive conduct was reasonable; and (4) the Local Office's prohibition on FAIR's efforts to advocate its position to a captive audience was not motivated by opposition to its viewpoint.  See Families Achieving Independence & Respect v. Nebraska Dep't of Social Servs., 890 F. Supp. 860 (D. Neb. 1995) (FAIR).  A panel of this Court reversed in a subsequently vacated opinion, see Families Achieving Independence & Respect v. Nebraska Dep't of Social Servs., 91 F.3d 1076 (8th Cir. 1996), and we now affirm.

## I.

Under Federal Rule of Civil Procedure 52(a), this Court typically reviews a district court's findings of fact for clear error.  In New York Times Co. v. Sullivan, 376 U.S. 254 (1964), however, the Supreme Court held that, in cases involving the First Amendment, appellate courts must "make an independent examination of the whole record" to ensure that its "judgment does not constitute a forbidden intrusion on the field of free expression."  Id. at 285.

In Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485 (1984), the Supreme Court explained that the appellate standard of review in a First Amendment case "must be faithful to both Rule 52(a) and the rule of independent review applied in New York Times Co. v. Sullivan."  Id. at 499.  Our review of First Amendment claims therefore

---

[1]The Honorable Robert G. Kopf, United States District Judge for the District of Nebraska.

carries with it a constitutional duty to conduct an independent examination of the record as a whole, without deference to the trial court. The requirement of independent appellate review is a rule of federal constitutional law, which does not limit our deference to a trial court on matters of witness credibility . . . . Even where a speech case has originally been tried in a federal court, subject to the provision of Federal Rule of Civil Procedure 52(a) that findings of fact shall not be set aside unless clearly erroneous, we are obliged to make a fresh examination of <u>crucial facts</u>.

<u>Hurley v. Irish-American Gay, Lesbian, & Bisexual Group of Boston</u>, 115 S. Ct. 2338, 2344 (1995) (quotations and alterations omitted) (emphasis added).

This Court's "independent review function is not equivalent to a 'de novo' review of the ultimate judgment itself, in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes that judgment should be entered for plaintiff." <u>Bose</u>, 466 U.S. at 514 n.31. Instead, we review findings of noncritical facts for clear error. <u>See</u> <u>id.</u> ("There are, of course, many findings of fact in a defamation case that are irrelevant to the constitutional standard of <u>New York Times Co. v. Sullivan</u> and to which the clearly-erroneous standard of Rule 52(a) is fully applicable."). We independently review the evidentiary basis of critical facts, giving due regard to the trial court's opportunity to observe the demeanor of witnesses. <u>Hurley</u>, 115 S. Ct. at 2344. Based on our independent review of the record, we present the following recitation of facts in this case.[2]

---

[2]We note that few of the facts in this case were in dispute; the parties made extensive factual stipulations, <u>see</u> Def. Ex. 101, Pl. Exs. 1 & 2, and much of the testimony at trial was uncontroverted.

NDSS is an agency of the State of Nebraska which provides assistance to low-income individuals and families. In addition to supervising and distributing financial assistance programs such as food stamps, Aid to Dependent Children (ADC), and Medicaid, NDSS provides child welfare and adult protective services. NDSS maintains both the Local Office and a central office in Lincoln, Nebraska. The Local Office does not formulate or debate public policy, but rather is concerned solely with the delivery of social services to Nebraska's most impoverished citizens.

The Local Office is housed on the second floor of a privately-owned commercial building. Within the Local Office is a lobby or reception area where NDSS clients can wait before picking up food stamps, applying for assistance, or speaking with caseworkers (Lobby). The Lobby contains two small bulletin boards and a table with several chairs.[3] Because

---

[3]The district court described the Lobby area at length:

The enclosed waiting/reception area of the local NDSS office is one large rectangular room comprised of (a) a reception area on the east side of the room, with space on the north side for a receptionist and bathrooms; (b) a food-stamp-issuance counter with approximately three "teller" stations located on the south side of the reception area; and (c) a waiting area on the west side of the room, with client interview rooms surrounding most of the waiting area of the room. One enters and exits the local NDSS office and the waiting/reception area from the east by passing through a small lobby and closed doors. The waiting area is roughly twice the size of the reception area. While the reception area does not contain seating, the waiting area does have seats. Located in the reception area adjacent to, and not far from, the food-stamp-issuance counter are two small bulletin boards with a table positioned in front of them. The evidence establishes that the bulletin boards are devoted almost exclusively to social-service notices regarding jobs and related information. A client desiring an interview in the privacy of a client interview room would walk directly from the waiting room into an interview room without traversing any barrier save for the door to the interview room. There is a

altercations between clients have

table in the waiting area.

FAIR, 890 F. Supp. at 863-64 (citations to record omitted).

occurred in the past, a uniformed guard is posted in the Lobby and provides security during working hours.

The Lobby is particularly busy during the first several days of each month when approximately one-third of the 5600 families receiving food stamps from the Local Office come in to pick up their monthly food stamps.[4] To limit congestion in such a high-traffic area and to ensure the dignified treatment of NDSS clients,[5] Daryl Wusk, the Administrator of the Local Office, created a general policy of keeping the Local Office closed to

---

[4]As Daryl Wusk, the Administrator of the Local Office, explained, "[t]he first five working days are usually very hectic. In the first three working days, for instance, in March [1995], we over-the-counter issued [food stamps] to about 1,920 households. That's for sure at least one individual, but many people don't come just by [them]selves. They come with children, they may come with a significant other, they may come with a grandparent and so the 1,920 [households are] really magnified by many other people." Trial Tr. at 120.

[5]Administrator Wusk explained that "we need to treat [NDSS clients] with dignity and treat them with respect, and I can require, within my office, my staff to do that, and, in fact, I make it mandatory." Trial Tr. at 120. NDSS clients, who have no choice but to come to the Local Office for the basic necessities of life, "have expectations that they should not have to go through a large group of people s[i]tting wanting to give them information because they usually come with very specific reasons in mind. I need food, I need shelter, I need clothing, I need medical, and when we start to put large groups or other groups in there offering literature and those kinds of things, it's easy to infringe on [NDSS] customers' rights." Trial Tr. at 119-20.

outside groups (Policy).  The Policy, which was unwritten, provided that

> (a) "advocacy groups," regardless of whether Wusk agreed or disagreed with the group's message, were never allowed access to the waiting/reception area for advocacy purposes; and (b) only groups that provided a "direct benefit" associated with the "basic needs of [NDSS's] customers" were allowed access to the waiting/reception area.

FAIR, 890 F. Supp. at 865-66 (citations to record omitted; note omitted). This same Policy applied to the bulletin boards located in the Lobby.  See id. at 866-67.

Because "[m]ost groups self-identify as advocacy groups," Trial Tr. at 137 (testimony of Administrator Wusk), Administrator Wusk explained that he would examine the materials submitted by an outside group to determine if the Policy allowed an organization's access to the Lobby.  See id. at 137, 143.  Pursuant to the Policy, only four groups have been allowed to access NDSS clients in the Lobby.[6]  The Volunteer Income Tax Assistance (VITA) organization

_____

[6]Vicki Stippel, FAIR's project assistant and an NDSS client, testified at trial that several years before, when the Local Office was housed in a different building, she had observed a fifth group in the Lobby "signing people up for Girl Scouts."  Trial Tr. at 82. Ms. Stippel stated that she did not know if the Girl Scout group was passing out pamphlets or brochures because "I usually don't stop at the table to find out what's going on."  Id.  Administrator Wusk refuted this testimony, stating that "[w]e have had probably Girl Scouts on the premises, but I don't believe that they--that I recall [that they] ever set up a table to sign up and do those kinds of things."  Id. at 124.  The district court found that "Wusk specifically denied allowing the Girl Scouts access to the waiting/reception area to hand out materials," FAIR, 890 F. Supp. at 866 n.4, and "credit[ed] Wusk's testimony on this point."  Id. Reviewing this finding for clear error--as there is no apparent reason why the presence of Girl Scouts in the Lobby should be considered a "crucial fact"--we conclude that Wusk's testimony is sufficient to support the district court's factual finding.  See Ricks v. Riverwood Int'l Corp., 38 F.3d 1016, 1018 (8th Cir. 1994) ("[A] factual finding that is supported by substantial evidence on the record cannot be clearly erroneous.").

was allowed to provide free assistance to NDSS clients with their state and federal income tax returns. The Expanded Food and Nutritional Education Program (EFNEP) provided nutrition information and recipes. Head Start was allowed to register children in pre-kindergarten classes. Finally, Southeast Community College was allowed to register NDSS clients in English as a Second Language (ESL) and General Equivalency Diploma (GED) courses.[7] Outside groups which have sought, and been denied, access to the Lobby pursuant to the Policy include university social work classes, right-to-life groups, and "Mad Dads," a church-affiliated group which Administrator Wusk otherwise supported.

FAIR is a project of the Nebraska Center for Legal Services, which in turn is a special project of the Legal Aid Society of Omaha. The Director of the Nebraska Center for Legal Services, David Mumgaard, oversees a grant from the Woods Charitable Fund, which funds FAIR's activities.[8] FAIR, which is not incorporated

---

[7]The bulletin boards in the Lobby contained information regarding nutrition, health, housing, Head Start registration, volunteer tax assistance, a "parent's center" at the YWCA, employment and employment training opportunities, free stoves from a rent-to-own company, free admissions or family memberships to the Lincoln Children's Museum, and enrollment in "Tele-Care," a service offered by the Lincoln General Hospital to ensure participants' well-being on a daily basis. See Def. Ex. 1.

[8]Director Mumgaard testified that FAIR's grant could not "be used for activities related to partisan politics," Trial Tr. at 42, nor for "direct lobbying, that is as FAIR, lobbying state senators, the Governor, and others on these kinds of issues." Id. We note that the documents FAIR submitted to the district court pertaining to its grant do not describe these limitations on political activities. See Pl. Ex. 3.

and has no membership list, has two staff members, Sheryl Walker and Vicki Stippel, who receive scholarships in lieu of pay. Ms. Walker is FAIR's project facilitator, while Ms. Stippel is FAIR's project assistant.

FAIR describes itself as an educational support group for low-income persons. Among its goals, FAIR seeks to "more fully inform the public discussion and debate on the 'welfare system' and 'welfare reform.'" Pl. Ex. 3 at 1. "One of FAIR's activities is to represent the interests of its members, and other welfare recipients, before legislative bodies." Compl. at 8, reprinted in J.A. at 8. FAIR has distributed materials in the rotunda of the Nebraska State Capitol Building in Lincoln, and Ms. Stippel testified that she had presented information for FAIR to Nebraska legislative committees "numerous times." Trial Tr. at 92. Although FAIR registered as a lobbyist with the State of Nebraska in the spring of 1994, it later withdrew its registration on advice from the Nebraska Center for Legal Services.[9]

Together with the Nebraska Democratic Women, the Nebraska Women's Political Network, the National Organization of Women, and other groups, FAIR organized and sponsored a rally at the Nebraska State Capitol Building to be held February 14, 1995. The purpose of the rally was to "show strong, unified, grassroots opposition to the destruction of our nation's social safety net." Pl. Ex. 5. In January 1995, FAIR sought permission to post materials, distribute materials, and speak with NDSS clients in the Lobby during the

---

[9]Pursuant to Nebraska Revised Statute section 49-1434(3)(d) (1995), "[a]ny person who limits his or her activities to appearances before legislative committees . . . [or] to writing letters or furnishing written material to individual members of the Legislature or to the committees thereof" is not considered a lobbyist.

first three days of February.  FAIR specifically requested the first three days of the month because, as Ms. Walker explained, "that's normally when [NDSS clients] will come in to pick up their food stamps for that month." Trial Tr. at 50.

The materials FAIR wished to post and distribute in the Lobby included a flier which, referring to welfare reform, declared: "Stop the War on Poor Children!"  Pl. Ex. 5.  The flier went on to explain that this

> theme symbolizes the great human devastation which will ensue if proposals to eliminate and severely restrict housing assistance, child nutrition programs, food stamps, aid to poor children, and aid for the disabled (to name a few) are adopted.

Id.  FAIR also wished to distribute a brochure entitled "What About the Children?" Pl. Ex. 4, which outlined its views on welfare reform.  Finally, FAIR prepared a postcard, entitled "Our Children's Hearts Are In Your Hands," Pl. Ex. 6, for NDSS clients to send to Nebraska state legislators during the legislative session.  The postcard, which portrayed a child's hand print and had a space to write a child's name and age, included the following specific requests regarding welfare reform:

> **Please**--no lifetime limit that will add to homelessness. **Please**--no orphanages just because we are poor.  **Please**--no new baby penalties (family caps).  Don't punish us because we are born and our parents are poor.

Id. (emphasis in original).

Administrator Wusk denied FAIR access to the Lobby and bulletin boards because FAIR did not offer a direct benefit to NDSS

clients.[10]  FAIR was unable to distribute its materials elsewhere in the same building which houses the Local Office, but was able to distribute the materials on the public sidewalk adjacent to the building.[11]

FAIR brought this action in the district court seeking to permanently enjoin the Local Office from enforcing its Policy. Following a hearing, the district court denied FAIR relief.  The court determined that, under several alternative Supreme Court tests, the Lobby was not a public forum. See FAIR, 890 F. Supp. at 871.  Because the Lobby was not a public forum, the policy limiting expressive conduct in the Lobby could be upheld if it was "reasonable," see id. at 874, and if the Policy was not an effort to discriminate on the basis of the speaker's viewpoint.  See id. at 877.  The district court, finding that "neither the unwritten

---

[10]In an affidavit, Mary Dean Harvey, the Director of NDSS and Administrator Wusk's superior, stated that she and Wusk had discussed his decision to deny FAIR access to the Lobby "on the basis that only groups who offer a direct service or benefit to our clients are allowed on our office premises in order to access our clients directly," Def. Ex. 3 at 1, and that she "concurred with that decision as the appropriate statement of our current policy on this issue . . . ."  Id.

[11]Ms. Stippel testified that she had been unable to set up a table and chairs while distributing information regarding the rally on the sidewalk outside of the building housing the Local Office. See Trial Tr. at 89-90.  This contradicted Ms. Walker's testimony to some extent, who testified that she "thought we did keep our chairs."  Id. at 64.  Ms. Stippel also noted that she "did get in a few heavy discussions" while distributing materials, id. at 89, and testified that:

> I remember one young man specifically who doesn't pay his child support, and, you know, didn't feel he needed to, and we got into a discussion about child support issues and the fact that, you know, a lot of people are on welfare because they don't get their child support.

Id. at 99.

-11-

nature of the policy nor the substance of the policy itself afforded Wusk or anyone else overly broad discretion in violation of the First Amendment," id. at 875 n.14, held that the plaintiffs' First Amendment rights had not been violated. See id. at 877-78. The district court also held that FAIR's right to equal protection had not been violated. Id. at 878. FAIR now appeals.

On appeal, FAIR argues that (1) the Policy on access by outside groups is vague;[12] (2) NDSS created a limited public forum by opening the Lobby to other groups and that FAIR was improperly denied access to that forum in violation of the First Amendment; and (3) NDSS violated FAIR's right to equal protection. We address these issues in turn.

### III.

We first address FAIR's contention that the Policy limiting access to the Lobby by outside groups is vague. Initially, we reject the notion that the Policy is necessarily vague because it is unwritten. So long as a policy is made explicit by "'well-established practice,'" Lebron v. National R.R. Passenger Corp. (AMTRAK), 69 F.3d 650, 658 (2d Cir. 1995) (quoting City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 770 (1988)), opinion amended on denial of reh'g, 89 F.3d 39 (2d Cir. 1995), cert. denied, 116 S. Ct. 1675 (1996), "[t]he fact that a policy is not committed to writing does not of itself constitute a First Amendment violation." Id. As noted by the district court,

---

[12]Although FAIR's contention that the Policy is vague was not included in FAIR's original complaint, the district court briefly considered and rejected FAIR's argument that the Policy was arbitrary. See FAIR, 890 F. Supp. at 875 n.14 (concluding that the Policy was "clear and simple," and that it did not "afford[] Wusk or anyone else overly broad discretion in violation of the First Amendment").

there was little or no practical reason for Wusk (or the other
defendants) to write a regulation since the regulation was
clear and simple: the forum was generally closed except to
welfare recipients. . . . [T]o the extent that the policy
contained an exception for outside groups, the exception was
quite limited, and it too was clear and simple: only groups
that provided a "direct benefit" associated with the "basic
needs of our customers" were allowed access to the forum.

FAIR, 890 F. Supp. at 875 n.14.


We have held that, "[t]o 'survive a vagueness challenge, a statute
must give the person of ordinary intelligence a reasonable opportunity to
know what is prohibited and provide explicit standards for those who apply
the statute.'"  United States v. Dinwiddie, 76 F.3d 913, 924 (8th Cir.)
(quoting Video Software Dealers Ass'n v. Webster, 968 F.2d 684, 689 (8th
Cir. 1992)), cert. denied, 117 S. Ct. 613 (1996).  In examining the terms
of a rule for vagueness, the Supreme Court has noted that

there are limitations in the English language with respect to
being both specific and manageably brief, and it seems to us
that although the prohibitions [here] may not satisfy those
intent on finding fault at any cost, they are set out in terms
that the ordinary person exercising ordinary common sense can
sufficiently understand and comply with, without sacrifice to
the public interest.

CSC v. Letter Carriers, 413 U.S. 548, 578-79 (1973) (upholding restrictions
on federal employees' political activities) (emphasis added); see also
Cornerstone Bible Church v. City of Hastings, 948 F.2d 464, 473-74 (8th
Cir. 1991) (rejecting argument that ordinance was impermissibly vague for
failing to define "church," "private club," and "economic activity"); cf.
Tindle v. Caudell, 56 F.3d 966, 973 (8th Cir. 1995) ("[T]he ability to
conceive of hypothetical problematic applications does not render the rules

-13-

susceptible to an over-breadth challenge.") (noting that rules which did "not precisely define what would constitute impermissible conduct" were nevertheless not vague because "they give adequate notice that high standards of conduct are required").

Examining the Policy in light of these principles of common sense and well-established practice, we conclude that the Policy is not vague. The Policy has three critical concepts: first, advocacy groups are barred from accessing NDSS clients in the Lobby for advocacy purposes; second, groups seeking access to the Lobby must provide a direct benefit to NDSS clients and their families; and third, the direct benefit must meet an NDSS client's basic needs. We examine these concepts in turn.

We do not believe that the phrase "advocacy group," standing alone, is vague.[13] At trial, Administrator Wusk defined an "advocacy group" as a group which "promotes an issue," Trial Tr. at 137, a definition which included "political" groups and groups involved "in promoting and changing public policy." Id. at 144. This definition states the common sense, lay understanding of the term. See, e.g., Webster's II New Riverside University Dictionary 81 (1984) (defining "advocacy" as "[a]ctive support, as of a cause"); Webster's Ninth New Collegiate Dictionary 59 (1986)

_____

[13]Indeed, in Cornelius v. NAACP Legal Defense & Educ. Fund, 473 U.S. 788 (1985), the Supreme Court was called upon to interpret this very phrase. See id. at 811-12 (accepting argument that "a decision to exclude all advocacy groups, regardless of political or philosophical orientation, is by definition viewpoint neutral," and stating that "we accept the validity and reasonableness of the justifications offered by [the government] for excluding advocacy groups" (emphasis added)). In remanding to the district court for a factual determination of whether viewpoint discrimination had taken place, the Court never declared the phrase "advocacy group" to be vague or overbroad.

(defining "advocacy" as "the act or process of advocating: support").

Administrator Wusk's definition of "advocacy group" has been applied consistently in practice; those groups allowed access to the Lobby--VITA, EFNEP, Head Start, and Southeast Community College--were not engaging in "promoting and changing public policy."  Trial Tr. at 144.  Indeed, Head Start programs are prohibited by federal law from engaging in "any partisan or nonpartisan political activity," 42 U.S.C. § 9851(b)(1), and there is no evidence in the record to suggest that the provision of tax assistance by VITA, nutrition information by EFNEP, or GED and ESL classes by Southeast Community College involved debating or advocating changes in public policy.

Similarly, those groups allowed access to the bulletin boards in the Lobby were not supporting political causes.  We have independently examined the record, and it is clear that the bulletin boards were used only to advertise the availability of social services by government agencies and private organizations, the existence of employment and educational opportunities, and the offer of free goods and services to NDSS clients. There is not a scintilla of evidence in the record to suggest that the bulletin board was used for "active support, as of a cause."  Webster's II New Riverside University Dictionary 81.

FAIR, by contrast, is clearly an advocacy group, and accordingly was denied access to the Lobby.  The materials that FAIR wished to distribute in the Lobby represented a platform with specific public policy objectives and advocated for a specific political agenda.  FAIR wished to distribute post cards to NDSS clients, which were to be mailed to Nebraska state senators, asking for specific legislative actions on welfare reform.  See Pl. Ex. 6

("no lifetime limit," "no orphanages," "no new baby penalties"). FAIR wished to distribute brochures which criticized political leaders for apparently inconsistent approaches to child-support and welfare-reform issues. See id. (quoting Nebraska Governor Ben Nelson's support of the child-support enforcement program, and asking, "Why does this philosophy not apply to the Welfare Reform proposals that will negatively affect the children even more? **THINK ABOUT IT!**" (emphasis in original, large lettering omitted)). FAIR wished to post a flier which advertised FAIR's alliance with a major political party in staging a rally opposing welfare reform. See Pl. Ex. 5 (rally to "Stop the War on Poor Children!" sponsored by FAIR and Nebraska Democratic Women).[14] The exclusion of FAIR is thus entirely consistent with the common-sense application of the Policy.[15]

---

[14]We must echo the district court's concise rejection of FAIR's attempt to liken itself to the groups allowed access to the Lobby:

> To the extent that Plaintiffs try to equate . . . their expressive activity, which is explicitly intended to urge adoption of public policy positions ("Stop the War on Poor Children"), with expressive activity intended to provide information on meal preparation and the like, I reject the comparison as factually unfounded. . . . This is true because one type of speech is intended to persuade on issues of public policy, while the other is intended to convey factual information on basic human needs totally unrelated to public policy.

FAIR, 890 F. Supp. at 872. How FAIR reconciles its status as an apolitical grant recipient with its intensely political agenda, associations, and activities is not an issue before us.

[15]FAIR's exclusion may also be consistent with other provisions of Nebraska law. Administrator Wusk testified that he believed that the Local Office was a voter registration site. See Trial Tr. at 150. Pursuant to Nebraska Revised Statute section 32-307, which came into effect on January 1, 1995,

> No materials advocating or advertising any political issue, candidate, or party shall be displayed or distributed within fifty feet of any voter registration site.

Neb. Rev. Stat. § 32-307 (1995) (emphasis added).

-16-

Nor is the concept of a "direct benefit," in the parameters of the Policy, vague. Under consistent Local Office practice, the Policy requires that a concrete good, service, or educational or employment opportunity go directly to NDSS clients and their families. See, e.g., Def. Ex. 1 (bulletin board advertisements offering NDSS clients free stoves, volunteer tax assistance, enrollment in Head Start, and job opportunities with the Gallup Organization). Only groups offering such tangible goods, services, or educational or employment opportunities directly to NDSS clients or their families have been allowed access to the Lobby. VITA offered tax assistance directly to NDSS clients; EFNEP offered nutrition advice directly to NDSS clients; Head Start offered pre-kindergarten education directly to NDSS clients' children; and Southeast Community College offered GED and ESL classes directly to NDSS clients.

By contrast, FAIR wished to promote a legislative agenda through the assistance of NDSS clients. See Pl. Ex. 6 (postcard for NDSS clients to send to Nebraska state senators). It offered no goods or services to NDSS clients, but rather wished to "educate" its desired audience on the dangers of welfare reform. See Pl. Ex. 5 (describing "the great human devastation which will ensue if proposals" for welfare reform are adopted). An attempt to proselytize a specific political viewpoint does not offer a "direct benefit" as defined by the Policy.[16]

---

[16]In NAACP Legal Defense and Educ. Fund v. Campbell, 504 F. Supp. 1365 (D.D.C. 1981), the NAACP challenged the federal government's limitation on access to the Combined Federal Campaign (CFC) to those groups which provided "direct services." The district court, although noting that direct services "may appear at first glance to have a plain, unambiguous meaning sufficient to guide governmental decisionmaking," found that the phrase was vague. See id. at 1367. This decision was not appealed. See Cornelius, 473 U.S. at 793 (discussing history of litigation). We have considered the Campbell decision and do not find it persuasive on the issue before us.

Nor do we find the phrase "basic needs" to be vague.  In the context of the Local Office, an agency working with the most impoverished members of society, the phrase refers to "food, clothing and shelter," Trial Tr. at 141 (testimony of Administrator Wusk), and such fundamental requirements for functioning within our society as employment and a rudimentary education.  It is apparent that the groups allowed access to the Lobby provided resources to meet these basic needs.  EFNEP offered information on nutrition; as Administrator Wusk noted, "[NDSS customers] can't live very well and healthy without good nutrition."  Id. at 136.  Head Start offered pre-school education to children and Southeast Community College offered GED and ESL courses to adults.  Because some NDSS clients found tax forms "very complicated sometimes, and they don't understand them," Trial Tr. at 121 (testimony of Administrator Wusk), VITA provided assistance with state and federal tax returns.[17]

These phrases, taken separately, are not vague, and they do not become vague when considered as a whole, in the context of a welfare office and in light of the purpose of the Policy.  The

[17]The materials posted on the Lobby's bulletin boards further illustrate these basic needs.  These materials advertised nutritional assistance, health care and housing resources, and offers of employment and educational opportunities. See Def. Ex. 1.  In addition, the Lincoln Children's Museum "addresse[d] a psychological need," Trial Tr. at 141 (testimony of Administrator Wusk), by offering free admission to NDSS clients' children, allowing "families to deal with some of the stress that is maybe going on . . . ." Id. at 133.

-18-

Local Office neither "formulates nor debates public policy," FAIR, 890 F. Supp. at 863, but rather provides "a broad range of services to welfare recipients." Id. The purpose of the Policy was "to minimize the numbers of groups allowed access to the office area . . . as much as possible," Trial Tr. at 150-51 (question to and response of Administrator Wusk), in order to limit congestion in the Lobby[18] and to ensure the dignified treatment of NDSS clients by not "forc[ing] NDSS customers to encounter individuals promoting a particular political point of view in order to obtain the necessities of life." Fair, 890 F. Supp. at 866. That the Policy is sufficiently well-defined is demonstrated by the rigorous consistency with which it has been applied. While the terms of the Policy "may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest." Letter Carriers, 413 U.S. at 579.

## IV.

Because the Policy is not vague, it is necessary to determine whether, as applied, the Policy is unconstitutional. It is uncontested that FAIR wished to engage in expressive conduct generally protected by the First Amendment. This determination, however, only begins our analysis of whether the First Amendment was violated by the Policy.

---

[18]As Administrator Wusk explained, "you have [to] manage the office area, and it would be very difficult to let a horde of folks come in because how would you do business. Our business is about serving our Social Service customers, and it would become difficult to manage that kind of influx of folks." Trial Tr. at 136.

It is fundamental that the "existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 44 (1983). In Perry, the Supreme Court described three categories of public fora: (1) the traditional public forum; (2) the designated public forum; and (3) the nonpublic forum.

In traditional public fora, such as streets and parks, expressive rights receive the greatest degree of protection:

> In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the State to limit expressive activity are sharply circumscribed. . . . [In] public forums, the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.

Id. at 45 (citations omitted); see also International Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678-79 (1992) (describing categories of fora); Forbes v. Arkansas Educ. Television Communication Network Foundation, 22 F.3d 1423, 1429-30 (8th Cir. 1994) (en banc) (interpreting Perry). The second category of fora, the designated public forum, "consists of public property which the State has opened for use by the public as a place for expressive activity." Perry, 460 U.S. at 45. So long as the state maintains a forum that is generally open to the public, it is "bound by the same standards as apply in a traditional public forum," id. at 46, and a "content-based prohibition must be

narrowly drawn to effectuate a compelling state interest."  Id.; see also Cornelius v. NAACP Legal Defense & Educ. Fund, 473 U.S. 788, 800 (1985) ("[W]hen the Government has intentionally designated a place or means of communication as a public forum speakers cannot be excluded without a compelling governmental interest.").

In distinguishing between a traditional public and designated public forum, the Court in Lee explained that a traditional public forum has

> immemorially been held in trust for the use of the public and, time out of mind, [has] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. . . . [A] traditional public forum is property that has as a principal purpose the free exchange of ideas.

505 U.S. at 679 (quotations, citations, and alteration omitted).  By contrast, a designated public forum is public property where the government intentionally allows discourse.  The Lee Court explained that

> consistent with the notion that the government--like other property owners--has power to preserve the property under its control for the use to which it is lawfully dedicated, the government does not create a public forum by inaction.  Nor is a public forum created whenever members of the public are permitted freely to visit a place owned or operated by the Government.  The decision to create a public forum must instead be made by intentionally opening a nontraditional forum for public discourse. . . . [T]he location of property also has bearing because separation from acknowledged public areas may serve to indicate that the separated property is a special enclave, subject to greater restriction.

Id. at 679-80 (citations and quotations omitted).[19]

The third category of fora, the nonpublic forum, consists of all other public property.  See Lee, 505 U.S. at 678-79.  "Public property which is not by tradition or designation a forum for public communication is governed by different standards."  Perry,  460 U.S. at 46.  These standards reflect the recognition that

> the First Amendment does not guarantee access to property simply because it is owned or controlled by the government.  In addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials

---

[19]In Lee, the Supreme Court held that a public airport was not a traditional or designated public forum, and upheld a ban on solicitation.  See 505 U.S. at 683, 685.  In International Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 830 (1992) (per curiam) (Lee II), a companion case to Lee, the Court held that a ban on the distribution of literature in the airport was nevertheless unconstitutional, and relied by reference on various concurring and dissenting opinions in Lee, which had disagreed with the majority's forum analysis.  See id. at 831.

In the instant case, the district court undertook an analysis of the forum under the tests enunciated by the majority in Lee as well as the principal concurrence, and concluded that the result-- that the Lobby was a nonpublic forum--was the same under both.  See FAIR, 890 F. Supp. at 868-74.  We agree with the district court that either test would achieve the identical result, and we agree that the Supreme Court could have been clearer in its directives in this area.  See, e.g., AIDS Action Comm. of Mass., Inc. v. MBTA, 42 F.3d 1, 9 (1st Cir. 1994) (describing "the relatively murky status of the public forum doctrine"); Jacobsen v. United States Postal Serv., 993 F.2d 649, 655 n.2 (9th Cir. 1992) (noting that, as a result of Lee, "the jurisprudence in this area is now quite muddied").  We believe, however, that the district court's duplication of effort was unnecessary. Chief Justice Rehnquist's opinion in Lee, which clearly set out the mechanics of forum analysis, commanded a majority of the Court, and Lee II in no way overruled its companion case.  Because of this, for our forum analysis we have only relied on the majority's opinion in Lee.

> oppose the speaker's view.  As we have stated on several occasions, the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.

Id. at 46 (quotations and citations omitted); see also Cornelius, 473 U.S. at 799-800 ("Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities."); Greer v. Spock, 424 U.S. 828, 836 (1976) ("The guarantees of the First Amendment have never meant that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.") (quotations and citation omitted).

FAIR does not contend that the Lobby is a traditional public forum, see Appellant's Br. at 31 ("plaintiffs agree that the lobby of the Lancaster County Office of the Nebraska Department of Public Services is not a traditional public forum"), and we agree.  There was no evidence presented that the Lobby has traditionally been used for public expression and, rather than having as a principal purpose the free exchange of ideas, the Lobby is used to distribute "a broad range of services to welfare recipients."  FAIR, 890 F. Supp. at 863.

Nor has the Lobby been intentionally opened to public discourse. There was no evidence presented that the Local Office has a policy of free access to the Lobby for expressive activities.  To the contrary, Administrator Wusk testified that the Local Office did not wish to "open [the Lobby] up for the world," Trial Tr. at 120, and intended "to minimize the numbers of groups allowed access to the office area . . . as much as possible."  Id. at 150-51 (question to and response of Administrator Wusk). FAIR contends,

however, that in allowing groups like Head Start to distribute materials in the Lobby, the Local Office necessarily created a designated public forum.  We disagree.

The Supreme Court has made clear that "a practice of allowing some speech activities on [government] property do[es] not add up to the dedication of [government] property to speech activities."  United States v. Kokinda, 497 U.S. 720, 730 (1990) (plurality opinion).  In Greer, the Supreme Court held that a military base was not a designated public forum, and that a prohibition on political campaigning on the base was reasonable.  In reaching this decision, the Court explained:

> The fact that other civilian speakers and entertainers had sometimes been invited to appear at Fort Dix did not of itself serve to convert Fort Dix into a public forum or to confer upon political candidates a First or Fifth Amendment right to conduct their campaigns there.  The decision of the military authorities that a civilian lecture on drug abuse, a religious service by a visiting preacher at the base chapel, or a rock musical concert would be supportive of the military mission of Fort Dix surely did not leave the authorities powerless thereafter to prevent any civilian from entering Fort Dix to speak on any subject whatever.

424 U.S. at 838 n.10.

Where "government property is not dedicated to open communication the government may--without further justification--restrict use to those who participate in the forum's official business."  Perry, 460 U.S. at 53 (note omitted).  The only groups allowed access to the Lobby, "[j]ust like NDSS . . . provided basic social services to welfare recipients."  FAIR, 890 F. Supp. at 871.  For example, the Local Office had once provided NDSS clients with nutritional information from the Department of Agriculture.  See

Trial Tr. at 122 (testimony of Administrator Wusk). Providing this information had proven considerably burdensome, see id. ("[w]e could not handle the volume of folding and stuffing" of the nutritional literature), and the Local Office made an arrangement with EFNEP "that they would be able to set up a presence [in the Lobby] periodically to handle, hand out those kinds of literature things." Id. at 123. Administrator Wusk also explained that NDSS was involved in the Job Training Partnership, and had identified NDSS clients' lack of English skills and lack of a high school diplomas as barriers to employment. See id. Southeast Community College's "presence [in the Lobby] has been to remove those barriers for those customers so that they could obtain their high school diploma which would better help them in the employment world or help them with learning the English language." Id.

Because the "providers of information on nutrition and the like were participating with the agreement of welfare officials in the welfare office's official business--the provision of basic social services to welfare recipients . . . the use of the property by groups such as the county extension agency providing nutritional information does not transform the property into a public forum." FAIR, 890 F. Supp. at 872. We therefore agree with the district court that the Lobby was not a designated public forum.

**V.**

Because the Lobby was neither a traditional public forum nor a designated public forum, the Policy

> must be analyzed under the standards set forth for nonpublic fora: It must be reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view. Indeed, control over access to a nonpublic forum can be based on subject matter and

-25-

> speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral. The Government's decision to restrict access to a nonpublic forum need only be <u>reasonable</u>; it need not be the most reasonable or the only reasonable limitation.

<u>Kokinda</u>, 497 U.S. at 730 (quotations and citations omitted) (first emphasis added, second emphasis in original); <u>see also</u> <u>Perry</u>, 460 U.S. at 49 ("Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property. The touchstone for evaluating these distinctions is whether they are reasonable in light of the purpose which the forum at issue serves."). In addition, "[c]onsideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved." <u>Kokinda</u>, 497 U.S. at 732 (quotations and citations omitted). In addressing the reasonableness of the Policy, we are not unmindful of the Local Office's expertise in the management of a welfare office. <u>See</u> <u>New York City Unemployed & Welfare Council v. Brezenoff</u>, 742 F.2d 718, 723 (2d Cir. 1984) (noting that welfare agency "has much more experience managing welfare offices than the courts have and must be given some discretion in determining what its interests are and how best to further them").

**A.**

We conclude that the Local Office's Policy of limiting access to the Lobby and bulletin boards is clearly reasonable. The Lobby

--a workplace where government employees provide financial assistance and social services to thousands of clients--is a high-traffic area which requires a uniformed guard to prevent disruption. Keeping the Lobby generally closed to outside groups helps prevent additional congestion and the resultant disruption. Administrator Wusk testified:

> I actually have a concern about any group, even the four that we allow, creates some traffic flow problems because of the volume of people that are in the office. Anytime you interject another factor into a confined space . . . it creates an issue to deal with. Sometimes it may not be very disruptive, but it can be if you have something else going on.

Trial Tr. at 128. Limiting congestion and disruption is, of course, a legitimate and reasonable goal for NDSS. See Lee, 505 U.S. at 683-84 (restriction on solicitation reasonable in part because it limits disruption).[20]

NDSS's specific prohibition on access to the Lobby by advocacy groups is also reasonable. It is reasonable for NDSS to shield its clients from a deluge of political propaganda that they are powerless to avoid. Clients receiving assistance from NDSS are a virtually captive audience; as noted by Administrator Wusk:

> When customers come to the Department of Social Services to apply for ADC or food stamps or Medicaid . . . they

---

[20]Similarly, the bulletin boards in the Lobby are small and largely dedicated to social services postings. See FAIR, 890 F. Supp. at 876 ("The fact is that space on the bulletin boards is quite limited as they are small. [Trial Tr. at 132.] Indeed, in the photos introduced into evidence, the bulletin-board space appears almost entirely devoted to social-service notices. (Ex. 1, Prelim. Hr'g (photos).)"). Preventing postings by outside groups is reasonable to allow space for official postings.

have no other choice.  We are the only office that offers those types of services.

Trial Tr. at 119.  We agree with the district court that:

> In this case, the waiting/reception area is filled with some of the most underprivileged in our society seeking benefits from the state for the most basic necessities of life. . . . [T]hese waiting/reception areas are not public or limited public forums but are, indeed, but holding stations for the most pitiful captive audiences in our country.
>
> These individuals--some of whom need protective services because of mental impairments, and all of whom need state assistance for some or all of the necessities of life--are peculiarly susceptible to coercion, whether subtle or overt, regarding, among other things, public-policy issues.  This is true both because of the welfare recipients' unfortunate stations in life and because of the captive nature of their attendance at the welfare office.

FAIR, 890 F. Supp. at 873-74 (quotations and citation omitted); see also Brezenoff, 742 F.2d at 722 (noting that welfare recipients "may well be peculiarly susceptible to verbal misrepresentations, whether because of the noisy and crowded atmosphere of [a welfare office] lobby, language barriers, or even a misperceived need to do anything necessary to ensure the receipt of welfare checks or to lessen the wait in [the welfare office]").

Beyond the Local Office's concern that its clients not be coerced by a barrage of political advertising, the Local Office has a legitimate interest in not being misapprehended as supporting one advocacy cause or another.  The Local Office's "position as a government controlled and financed public facility, used daily by thousands of people, ma[kes] it highly advisable to avoid the criticism and embarrassments of allowing any display seeming to

favor any political view."  <u>Lebron</u>, 69 F.3d at 658 (upholding AMTRAK's restriction on political advertisements as reasonable).[21]

That the Local Office made an exception to its general prohibition on access by outside groups for organizations such as EFNEP and VITA is also reasonable.  The official business of the Local Office is to provide services to NDSS clients.  <u>See</u> <u>FAIR</u>, 890 F. Supp. at 872.  In light of this official business, it is reasonable for the Local Office to allow access to the Lobby by groups which provide direct benefits which meet NDSS clients' basic needs, because this allows the Local Office to fulfill its mission.  <u>See, e.g.</u>, Trial Tr. at 122-23 (describing EFNEP's and Southeast Community College's direct contribution to NDSS's mission).

The reasonableness of the Policy is further supported because there are "substantial alternative channels that remain open" to outside groups to disseminate their message.  <u>Perry</u>, 460 U.S. at 53.  In this case, FAIR had access to the public sidewalks outside of the building housing the Local Office, <u>see</u> <u>FAIR</u>, 890 F. Supp. at 876, as well as other public fora. Although FAIR would undoubtedly prefer the opportunities presented by a captive audience in the Lobby, "[t]he First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message." <u>Cornelius</u>, 473 U.S. at 809.

---

[21]In addition, it is reasonable for the Local Office to wish to avoid the significant disruption that allowing advocacy groups to access the Lobby might cause, as disagreements could blossom between NDSS clients and representatives of the outside groups. <u>See</u> <u>FAIR</u>, 890 F. Supp. at 872 (recounting Ms. Stippel's testimony that she "encountered 'problems' when 'we gave the information to somebody that didn't agree with our side,' which in turn caused 'heavy discussions.'" (citations to record omitted)).

**B.**

We agree with the district court that the Policy "'is not an effort to suppress the speaker's activity due to disagreement with the speaker's view.'" FAIR, 890 F. Supp. at 877 (quoting Lee, 505 U.S. at 679). While the Policy's prohibition of access to the Lobby by outside advocacy groups does distinguish on the basis of message content, this is not synonymous with viewpoint discrimination. The Supreme Court has held that

> in determining whether the State is acting to preserve the limits of the forum it has created so that the exclusion of a class of speech is legitimate, we have observed a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations.

Rosenberger v. Rector & Visitors of Univ. of Va., 115 S. Ct. 2510, 2517 (1995).

FAIR has alleged that it was denied access to the Lobby due to its opposition to welfare reform. After FAIR had been denied permission to distribute and post its materials in the Lobby, Director Mumgaard contacted Administrator Wusk to discuss the adverse decision. Director Mumgaard testified that, during this conversation, Administrator Wusk explained that FAIR was denied permission because it was an advocacy group that did not provide a direct benefit to NDSS clients. See Trial Tr. at 21-22. Director Mumgaard testified that Administrator Wusk further stated:

> They [FAIR] talk about welfare reform, and they are critical of welfare reform, and we are the ones doing welfare reform . . . .

-30-

Id. at 22. Apparently based on this conversation, FAIR alleged that Administrator Wusk had denied FAIR access to the Lobby "because the information that FAIR intended to distribute was interpreted as being critical of welfare reform." Compl. at 5, reprinted in J.A. at 5.

In his trial testimony, Administrator Wusk repeatedly denied that his decision regarding FAIR had been based on its message. He stated that:

> It was not ever an issue thing with me. Whether they [FAIR] were welfare reform or not was not the issue with me. The issue was that they were an advocacy group.

Trial Tr. at 117; see also id. at 134 (denying that content or message of proposed postings affected his decision). Administrator Wusk explained that Director Mumgaard had "asked me if the reason we were denying access to FAIR in our reception area was because they had issues with welfare reform, and my comment was, is that the department--that the welfare reform legislation was supported by the Department of Social Services." Id. at 116-17. Administrator Wusk testified that a group advocating a contrary position to FAIR would also have been denied access to the Lobby, id. at 117, and that advocacy groups which he personally supported had been denied permission by him to use the Lobby. Id. at 126, 140-41 (discussing "Mad Dads").

The district court analyzed Administrator Wusk's and Director Mumgaard's testimonies, and found that "the only credible evidence was that Wusk (and the other defendants) enforced the ban [on advocacy groups] regardless of whether Wusk (or the other defendants) agreed or disagreed with the message of the speaker." FAIR, 890 F. Supp. at 866 n.2. Having made an independent review

of the record, and giving due deference to the trial court's opportunity to observe witness demeanor, we agree that Administrator Wusk's decision denying access to FAIR was not based on FAIR's viewpoint, but rather upon the Policy of excluding advocacy groups which did not provide a direct benefit to NDSS clients' basic needs.

The content of FAIR's message was political advocacy--a type of speech not allowed by the Policy. Because FAIR's viewpoint was irrelevant to the decision to disallow its access to the Lobby, there was no viewpoint discrimination. Because the Policy is otherwise reasonable, the Policy does not violate the First Amendment.

## VII.

Because FAIR has no First Amendment right to access the Lobby, its equal protection argument must fail unless FAIR can show that it is similarly situated to those groups allowed access. See Perry, 460 U.S. at 55. Because FAIR is an advocacy group which does not provide a direct benefit which meets NDSS clients' basic needs, it is not similarly situated to those groups allowed access to the Lobby. NDSS has therefore not violated FAIR's right to equal protection in this case.

## VIII.

To preserve its clients' dignity and to maintain control over a hectic work environment, the Local Office created and rigidly enforced an innocuous Policy limiting access to its Lobby to nonadvocacy groups which provide direct benefits meeting NDSS clients' basic needs. Because the Lobby is a nonpublic forum, and

because the Policy regulating expressive activities in the Lobby is not vague, unreasonable, or viewpoint based, we affirm the district court's judgment for the defendant.

HEANEY, Circuit Judge, with whom McMILLIAN, MORRIS SHEPPARD ARNOLD, and MURPHY, Circuit Judges, join, dissenting.

I respectfully dissent. I do not believe that a state should be permitted to exclude a grass-roots, welfare-rights organization from engaging in speech activity in a welfare office lobby because of a low-level administrator's determination that the group does not provide a "direct benefit" to the welfare office's clientele. The constitutionality of FAIR's exclusion turns not on a labeling of the forum, but rather on the policy employed to decide which groups will have access to the lobby. That policy--as explained to FAIR at the time of its exclusion and as subsequently officially adopted by the NDSS--violates the First and Fourteenth Amendments under even the least-exacting reasonableness test in that it permits state officials to apply impermissibly vague criteria to distinguish between persons seeking to engage in speech activity on state property. See NAACP Legal Defense & Educ. Fund v. Campbell, 504 F. Supp. 1365, 1367 (D.D.C. 1981) (policy requiring a charity to provide "direct services" too vague to distinguish between groups for participation in a federally-sponsored fund-raising campaign). Because such a policy violates the First and Fourteenth amendments on its face, regardless of the forum to which it is applied, I would reverse the district court and leave the question of whether the welfare office lobby is a public forum for a another day. See Airport Comm'rs v. Jews For Jesus, 482 U.S. at 573-74 (unnecessary to reach the public forum question because regulation prohibiting all First Amendment activities in airport was facially unconstitutional under the overbreadth doctrine); Lebron v. National R.R. Passenger Corp. (AMTRAK), 74 F.3d 371, 372 (2d Cir.

1996) (C.J. Newman, dissenting) ("[N]o matter what the scope of the forum, a governmental entity violates the First Amendment when it bars display of political messages pursuant to a 'policy' that [is] vague, unwritten, unclear to those who must administer it, and inconsistently applied."), denying reh'g and amending, Lebron v. AMTRAK, 69 F.3d 650 (2d Cir. 1995).

The majority adopts the district court's finding that the policy used by Wusk to guide his decision to exclude FAIR from the lobby included a per se ban on admitting advocacy groups. Majority Op., supra, at 5 (citing FAIR, 890 F. Supp. at 865-66). While I have little doubt that a welfare office could ban advocacy groups using its facilities to advance specific political agendum without offending the First Amendment, that simply is not this case. As stipulated by the parties, the only reason Wusk did not allow FAIR representatives to be present in the lobby and distribute pamphlets like other groups had done in the past was because Wusk determined that FAIR did not provide a "direct benefit" to welfare recipients. (Pls.' Ex. 1 ("Stipulation of Uncontroverted Facts") at ¶ 15.) Similarly, Mary Dean Harvey, Director of NDSS makes no mention of a departmental position regarding "advocacy groups" in her subsequent affirmance of Wusk's actions and adoption of the policy. (See Defs.' Ex. 3 (Aff. of Mary Dean Harvey.)[22] True, Wusk provided

_____

[22]Harvey, who is ultimately responsible for all internal agency policies, states:

> [I]n late January 1995, I had communication with . . . Daryl Wusk[] regarding a request that he had received from a group calling itself "FAIR" to come to the District Office proper and distribute literature and engage in discussion with our clients[.]
>
> Mr. Wusk informed me of his tentative decision to reject the request on the basis that only groups who offer a direct service or benefit to our clients are allowed on our office premises . . . and I concurred with that decision as the appropriate statement of our current policy on this issue[.]
>
> . . . .

a more complex rationale for his decision <u>at the time of trial</u>, but this after-the-fact explanation carries little weight in light of the clear record that the Department's decision turned entirely on an assessment of the benefits associated with FAIR's message.

Thus, the question presented is whether the First and Fourteenth Amendments permit state officials to distinguish between groups given access to a welfare office based on whether the group provides a "direct benefit" to welfare recipients. If a governmental policy restricts protected expressive conduct, it will withstand constitutional scrutiny only if it is clear and consistently applied. <u>NAACP Legal Defense & Educ. Fund</u>, 504 F. Supp. 1365, 1367 (D.D.C. 1981).[23] Two particular concerns

> [T]he policy of the Department of Social Services is that no person or group should be allowed to come into our offices proper for the purpose of distributing literature, soliciting or otherwise engaging clients in discussion unless that person or group is offering a direct service or benefit to our clients[.]

(Defs.' Ex. 3 (Aff. of Mary Dean Harvey) at ¶¶ 2-3, 5 (emphasis added).) Although the majority acknowledges both the reason given by Wusk for FAIR's exclusion and Harvey's subsequent statements, (Majority Op., <u>supra</u>, at 9-10), it nonetheless adopts the district court's expansive version of the policy without explanation.

[23]I recognize that the void-for-vagueness doctrine developed in relation to criminal laws where the potential chilling effect on protected activity brought by an under-defined regulation and loosely-controlled governmental enforcement is most heightened. <u>See</u> <u>generally</u> Rotunda & Nowak, Treatise on Constitutional Law: Substance and Procedure § 20.9 (2d ed. 1992). Accordingly, courts employ a more tolerant vagueness test to purely economic regulations. <u>Fogie v. Thorn Americas, Inc.</u>, 95 F.3d 645, 650 (8th Cir. 1996) (citing <u>Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.</u>, 455 U.S. 489, 498-99 (1982)). Although the policy at issue here did not subject FAIR to criminal sanctions, it constituted the state's basis for regulating core expressive conduct and should be judged under a stringent vagueness test. <u>See</u> <u>Forsyth County, Georgia v. The Nationalist Movement</u>, 505 U.S. 123, 128-29 (1992) (county assembly and parade ordinance that permitted government administrator to vary the fee for assembling to reflect the estimated cost of maintaining public order held facially unconstitutional).

underlie

the vagueness doctrine: (1) the need to give notice of its meaning to those subject to the policy, and (2) providing officials with explicit guidelines to avoid arbitrary and discriminatory enforcement. Id. The welfare office policy fails on both counts. I agree with the district court that there is no evidence on this record to suggest that Wusk or anyone at NDSS intentionally discriminated against FAIR based on the group's message. FAIR need not demonstrate actual discrimination, however, where the potential for discrimination is significant. See Forsyth County, Georgia v. The Nationalist Movement, 505 U.S. 123, 128 (1992) ("It is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable."). The constitutional infirmity here derives from the policy's imprecision: it confers virtually unrestrained power on authorities to define what constitutes a direct benefit to welfare recipients. See Airport Comm'rs v. Jews For Jesus, 482 U.S. 569, 576 (1987) ("The opportunity for abuse, especially where a statute has received a virtually open-ended interpretation, is self-evident.").

It simply cannot be said that there are any narrowly drawn, reasonable or definite standards guiding Wusk's decisionmaking. According to his testimony at trial, Wusk reviews the literature from a group requesting access to the lobby and makes a subjective determination about the nature of the group's work. (Trial Tr.

137:1-144:6.)  Despite her best efforts, counsel for FAIR could not pin Wusk down on clear definitions of either "advocacy group" or a welfare recipient's "basic needs," the two additional concepts he introduced at trial to explain his process for deciding who can speak to welfare recipients.  With respect to the former, Wusk testified that an advocacy group is one that "promotes an issue."  (Trial Tr. 137:21-24.)  As to welfare clients' basic needs, Wusk explained that food, clothing, and shelter certainly qualify; in the same sentence, however, he asserted that even the Lincoln Children's Museum "addresses a psychological need" consistent with his agency's commitment to "deal with child welfare and trying to promote some healthy families."  (Trial Tr. 141:9-17.)  Moments before, in the same discussion, however, Wusk explained that he would not permit the Red Cross to use the lobby to distribute information on CPR because his "customers can live long and healthy [lives] without CPR training."  (Trial Tr. 135:22-136:14.)  Wusk's statements demonstrate the elasticity in the policy which he is left to administer at his whim.

I disagree with the majority's assertions that Wusk's policy has been applied consistently in practice.  (Majority Op., supra, at 14, 16.)  I see no basis for a bright-line distinction between several of the groups permitted access to the lobby and FAIR.  For example, Wusk allowed in-person registration for Head Start, a program with broad goals including "providing family-centered services for low-income families with very young children designed to promote the development of the children, and to enable their parents to fulfill their roles as parents and to move toward self-sufficiency"  42 U.S.C. § 9840a(a)(1) (1994).  Wusk also permitted the YWCA to post a brochure about parenting classes and the Lincoln Children's Museum to announce free admission for low-income families.  (Defs.' Ex. 1, Attch. 3.)  These programs, like FAIR, aim to make welfare recipients more informed citizens, better

prepared to raise children, and more full participants in society.  By mentioning the policy as applied to these other groups, I in no way intend to suggest that their missions are unworthy or that Wusk erred in giving any particular group access to his clientele.  Instead, I believe the comparison highlights the arbitrary line-drawing and inconsistent application inherent in the "direct benefit" policy.

The majority accepts that the concept "direct benefit" has concrete parameters entailing an offer of a tangible good, service, or educational or employment opportunity to NDSS families.  (Majority Op., supra, at 16.) But what constitutes a service to welfare recipients?  What is an educational opportunity?  Would it not be a service and educational opportunity to obtain information about reforms to the laws governing economic assistance for the poor?  Wusk's own assistant, who received FAIR's request, believed FAIR offered a direct benefit to welfare recipients and told Stippel that she did not believe there would be a problem with FAIR's request to use the lobby.  (Pls.' Ex. 1 (Stipulation of Uncontroverted Facts) at ¶ 13.)  It was only after she consulted Wusk that his assistant understood that FAIR did not qualify for admission under Wusk's interpretation of the policy.

The dangers of a vague standard are all the more heightened where, as here, a group seeks to engage in core expressive conduct protected by the First Amendment.  The Supreme Court recently observed that "handing out leaflets in the advocacy of a politically controversial viewpoint [] is the essence of First Amendment expression."  McIntyre v. Ohio Elections Comm'n, --- U.S.---, 115 S. Ct. 1511, 1519 (1995); see also Albany Welfare Rights Org. v. Wyman, 493 F.2d 1319 (2nd Cir.), cert. denied, 419 U.S. 838 (1974) (a blanket denial to welfare rights organization requesting to hand out leaflets at welfare office violates the

First Amendment).  FAIR is a grass-roots organization, established by two women on welfare, designed to educate welfare recipients and give them a voice in welfare reform.  FAIR wanted to provide information about the current welfare-reform debate and about the impact of proposed legislative changes.  It is well established that:

> [d]iscussion of public issues . . . [is] integral to the operation of the system of government established by our Constitution.  The First Amendment affords the broadest protection to such political expression in order "to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Roth v. United States, 354 U.S. 476, 484 (1957).  Although the First Amendment protections are not confined to "the exposition of ideas," Winters v. New York, 333 U.S. 507, 510 (1948), "there is practically universal agreement that a major purpose of the Amendment was to protect the free discussion to governmental affairs . . . ." Mills v. Alabama, 384 U.S. 214, 218 (1966).  This no more than reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."  New York Times v. Sullivan, 376 U.S. 254 (1964).

McIntyre, 115 S. Ct. at 1518-19.  Although the government need not permit all forms of speech on property that it owns and controls, it is nonetheless significant that NDSS's exclusion of FAIR burdened core speech.

Finally, I note that while I would reject the particular approach employed by NDSS to control speech activity on its premises, I would in no way preclude all restrictions on the use of its welfare office lobby.  Certainly the agency has a right--as well as a duty--to protect its clients from fraud, harassment, and undue annoyance.  Safety, over-crowding, and other administrative

constraints[24] present legitimate concerns which the state may address with a reasonable, clear, and consistently-applied policy to control access to its facilities.  Enforcement of a vague "direct benefit" requirement, however, in no way addresses those legitimate concerns and constitutes a practice that should not withstand constitutional scrutiny.

A true copy.

Attest:


CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[24]As the majority points out to make a different point, the local welfare office may face particular constraints because it is a voter registration site where state law prohibits the display or distribution of "materials advocating or advertising any political issue, candidate, or party." (Majority Op., supra, at 15-16 n.15 (quoting Neb. Rev. Stat. § 32-307 (1995).)